Ronald SANDERS, Appellant/Cross–Respondent,

v.

Iftekhar AHMED, M.D., Respondent/Cross–Appellant,

and

Iftekhar Ahmed, P.A., Respondent/Cross–Appellant.

No. SC 91492.

Supreme Court of Missouri, En Banc.

April 3, 2012.

Steven L. Hobson, H. William McIntosh, Meredith R. Myers, The McIntosh Law Firm PC, Kansas City, for Sanders.

Timothy M. Aylward, Brent G. Wright, John B. McEntee Jr., Horn Aylward & Bandy LLC, Norman I. Reichel, Oliver & Reichel PA, Kansas City, for Ahmed.

WILLIAM RAY PRICE, JR., Judge.

## I. Introduction

Ronald Sanders recovered judgments against Dr. Iftekhar Ahmed and Iftekhar Ahmed, P.A., (collectively, "Defendants") for the wrongful death of his wife. After the jury returned a verdict awarding $9.2 million in non-economic damages, the trial court entered a judgment providing $1,265,207.64 in noneconomic damages, in accordance with section 538.210,[1] which places a cap on non-economic damages. Mr. Sanders challenges the constitutionality of the damages award cap. Defendants appeal the judgment, the denial of reduction pursuant to section 537.060 and the denial of periodic payments under section 538.220. Mr. Sanders contends that periodic payments under section 538.220 violate the Missouri Constitution.

---

1. Section 538.210 was amended in 2005, after the time in which the purported negligence occurred. Section 538.210, RSMo 2000, the statute then in effect, governs unless otherwise noted.

Because Mr. Sanders alleges sections 538.210 and 538.220 are unconstitutional, this Court has jurisdiction. Mo. Const. art. V, sec. 3. Sections 538.210 and 538.220 are constitutional. The judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings related to reduction under section 537.060.

## II. Factual and Procedural Background

On May 21, 2003, Paulette Sanders went to the emergency department of the Medical Center of Independence ("MCI") with complaints of numbness in her legs and difficulty walking. Ms. Sanders had a long history of seizure disorders. Her primary care physician admitted Ms. Sanders to the hospital and requested a consultation by Dr. Ahmed, a neurologist. After reviewing her symptoms, Dr. Ahmed ordered a change in her medications from Dilantin and phenobarbitol to Depakote.

Ms. Sanders remained in the hospital, and by May 26, 2003, she had become lethargic. On May 27, 2003, Ms. Sanders suffered a focal seizure, which required emergency medical intervention. Dr. Ahmed ordered that Depakote be discontinued. Ms. Sanders suffered deterioration in both her mental and physical condition and became unresponsive to even painful stimuli. Ms. Sanders eventually was transferred to a long-term care facility, where she remained bedridden. She died in August 2005.

Ms. Sanders's husband, Ronald Sanders (hereinafter "Sanders"), filed a personal injury action on May 16, 2005. Sanders filed both on his own behalf for loss of consortium and as guardian ad litem on behalf of Ms. Sanders. After Ms. Sand-

ers's death, her estate was substituted as a plaintiff in the first amended petition.

On May 28, 2008, Sanders filed a second amended petition. This petition added one new defendant, dropped the estate as a co-plaintiff and dropped Sanders's claim for loss of consortium prior to his wife's death. It also added, for the first time, a claim for the wrongful death of Ms. Sanders. On September 3, 2008, Sanders filed a third amended petition, adding another defendant. Dr. Ahmed and his employer, Dr. Iftekhar Ahmed, P.A., (collectively, "Defendants") pleaded the affirmative defense of reduction,[2] as allowed by section 537.060, in anticipation of any settlements. Defendants also asserted the rights housed in chapter 538, RSMo, including the cap on non-economic damages.

In October 2009, Sanders dismissed three individual defendants with prejudice; Sanders then settled with and dismissed all remaining defendants except those involved in this appeal. Defendants requested discovery into the terms of the settlements; this motion was held in abeyance until after trial, at which point the parties stipulated to the amount of the settlements. Defendants also filed a motion for setoff, citing section 537.060, which also was held in abeyance until the · jury reached a verdict and at that time was denied.

On September 14, 2010, Sanders was granted leave to file an amended reply to Defendants' joint answer. This reply raised a number of constitutional objections to section 538.210.

During the September 2010 trial, Sanders submitted the case on the theory that Ms. Sanders had a defect that prevented her body from eliminating byproduct ammonia that was produced from the Depa-

---

**2.** Defendants referred to this defense as "setoff," which occasionally is used incorrectly instead of reduction; Defendants did so with reference to section 537.060.

kote ordered by Dr. Ahmed; Dr. Ahmed failed to recognize and properly treat the increasing ammonia level; and, as a result, Ms. Sanders suffered irreversible brain damage that ultimately caused her death. The jury returned its verdict in favor of Sanders and against Defendants.

The jury awarded damages as follows:

| | |
|---|---|
| For past economic damages: | $ 920,745.88 |
| For past non-economic damages: | $ 1,700,000.00 |
| For future non-economic damages: | $ 7,500,000.00 |
| | |
| Total damages: | $10,120,745.88 |

Following the verdict, Defendants made three motions: first, for the application of the cap on non-economic damages (section 538.210);[3] second, for the grant of a periodic payment plan (section 538.220);[4] and third, for reduction of damages by the amount Sanders settled with joint tortfeasors (section 537.060).[5] Sanders and Defendants stipulated that Sanders settled with other defendants for a total of $625,000.

The trial court entered an amended judgment on October 22, 2010. At that time, the court found that the statutory cap on non-economic damages was $632,603.82 per each of the two defendants. The amended judgment reduced plaintiffs non-economic damages from $9.2 million to $1,265,207.64.

Sanders filed a motion to amend the amended judgment, alleging that the statutory caps were unconstitutional. The trial court overruled that motion and Defendants' remaining motions.

### III. Sanders's Constitutional Claims

■■■ Constitutional challenges to a statute are reviewed *de novo*. *Rentschler v. Nixon*, 311 S.W.3d 783, 786 (Mo. banc 2010). A statute is presumed to be constitutional and will not be held unconstitutional unless it clearly and undoubtedly contravenes the constitution. *Lester v. Sayles*, 850 S.W.2d 858, 872 (Mo. banc 1993). The courts will enforce a statute unless it plainly and palpably affronts fundamental law embodied in the constitution. *Id.* The party claiming that the statute is unconstitutional bears the burden of proof. *Id.*

### A. Right of Trial by Jury

■■■ Article I, section 22(a) of the Missouri Constitution provides "[t]hat the

---

3. Section 538.210 provides: "In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty dollars per occurrence for non-economic damages from any one defendant as defendant is defined in subsection 2 of this section." Section 538.210.4 allows the court to adjust the cap for inflation. At the time of trial, the agreed-upon cap was set at $632,603.82.

4. Section 538.220 dictates that "[i]n any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, past damages shall be payable in a lump sum." However, "[a]t the request of any party to such action made prior to the entry of judgment, the court shall include in the judgment a requirement that future damages be paid in whole or in part in periodic or installment payments if the total award of damages in the action exceeds one hundred thousand dollars...."

5. Section 537.060 states: "When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater."

right of a trial by jury as heretofore enjoyed shall remain inviolate." This constitutional guaranty "means that all the substantial incidents and consequences, which pertained to the right of trial by jury, are beyond the reach of hostile legislation and are preserved in their ancient substantial extent as existed at common law." *State ex rel. St. Louis, K. & N.W. Ry. Co. v. Withrow*, 133 Mo. 500, 36 S.W. 43, 48 (1896). The Missouri Constitution itself creates a "cutoff" at which point the right is evaluated. "Particularly, the phrase 'as heretofore enjoyed' has been interpreted to mean that the constitution protects the right as it existed when the constitution was adopted and does not provide a jury trial for proceedings subsequently created." *Hammons v. Ehney*, 924 S.W.2d 843, at 848 (1996). "As heretofore enjoyed" refers to the right as it existed before the constitution's first adoption in 1820. *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898, 907 (Mo. banc 1992) (citation omitted).

This Court has already considered whether the legislature could limit noneconomic damages in a common-law personal injury claim relative to article I, section 22(a). *Adams*, 832 S.W.2d at 907. In Adams, this Court held that "the legislature has the right to abrogate a cause of action cognizable under common law completely." *Id.* at 907 (citing *DeMay v. Liberty Foundry Co.*, 327 Mo. 495, 37 S.W.2d 640, 649 (1931)). *Adams* then held, "If the legislature has the constitutional power to create and abolish causes of action, the legislature also has the power to limit recovery in those causes of action." *Id.*

■ We need not decide whether Sanders is correct that *Adams* incorrectly stated the law as to common law causes of action. Missouri does not recognize a common-law claim for wrongful death. This Court has reaffirmed time and time again that "a claim for damages for wrongful death is statutory; it has no common-law antecedent." *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82, 88 (Mo. banc 2003).[6] In its present form, the action for wrongful death is provided by section 537.080.1, RSMo 2000.[7] The legislature has the power to define the remedy available if it creates the cause of action. The Court's recent opinion in *Overbey* affirms:

> [T]he legislature has the authority to choose what remedies will be permitted under a statutorily created cause of action. . . .
>
> The legislature in so doing, at least in regard to a statutorily created cause of action . . . limited "the substance of the claims themselves," as it has a right to do in setting out the parameters of a statutory cause of action.

*Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 376 (Mo. banc 2012) (quoting *Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 141–42 (Mo. banc 2005)).

**6.** *See also Sullivan v. Carlisle*, 851 S.W.2d 510, 512 (Mo. banc 1993) (accord); *Powell v. Am. Motors Corp.*, 834 S.W.2d 184, 186 (Mo. banc 1992) (accord); *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 674 (Mo. banc 1991) (accord); *Cummins v. Kansas City Pub. Serv. Co.*, 334 Mo. 672, 66 S.W.2d 920, 923 (1933) (accord); *Chandler v. Chicago & A.R. Co.*, 251 Mo. 592, 158 S.W. 35, 36 (1913) (accord); *Clark v. Kansas City, St. L. & C. R. Co.*, 219 Mo. 524, 118 S.W. 40, 45 (1909) (accord);

*Barker v. Hannibal & St. J. R. Co.*, 91 Mo. 86, 14 S.W. 280, 281 (1886) (accord).

**7.** "Whenever the death of a person results from any act . . . or circumstance which, if death had not ensued, would have entitled such person to recover damages in respect thereof, the person or party who . . . would have been liable had death not ensued shall be liable in an action for damages, notwithstanding the death of the person injured. . . ."

Sanders attempts to avoid this result through three arguments that wrongful death is a common law cause of action rather than statutory: first, that the original proscription of the cause of action at common law was dicta; second, that Missouri did not adopt the common law bar on wrongful death recovery; and third, that wrongful death should be considered a continuation of the predicate tort causing death.

This Court has already rejected the dictum argument related to Lord Ellenborough's pronouncement in *Baker v. Bolton*, (1808) 1 Camp. 493; 170 Eng. Rep. 1033, which stated that one could not recover in court for the death of another. *See Glick v. Ballentine Produce, Inc.*, 396 S.W.2d 609, 614 (Mo. 1965), *overruled on other grounds by Bennett v. Owens–Corning Fiberglas Corp.*, 896 S.W.2d 464 (Mo. banc 1995); *see also Osborn v. Gillett*, L.R. 8 Ex. 88 (1873) (reaffirming *Baker*). This Court has also rejected Sanders's second argument. *Glick*, 396 S.W.2d at 614. 396 S.W.2d at 614 (emphasis in original), *overruled on other grounds by Bennett*, 896 S.W.2d 464 (Mo. banc 1995).

Sanders asserts, in the alternative, that his claim arises out of the underlying tort of medical negligence and, therefore, existed at common law. This incorrectly states the law. Wrongful death was, and is, a new statutory cause of action independent of the predicate tort. *Sullivan v. Carlisle*, 851 S.W.2d 510, 515 (Mo. banc 1993) ("[A] wrongful death claim ... is neither a transmitted right nor a survival right, but is created and vests in the survivors at the moment of death.") (citations omitted); *see also Lawrence v. Beverly*

*Manor*, 273 S.W.3d 525, 528–29 (Mo. banc 2009) ("Wrongful death ... is a cause of action separate from the underlying torts, although it is treated differently for the purposes of venue").

Here, the General Assembly merely placed limits on the amount of non-economic damages recoverable under a statutorily created cause of action.[8] The provisions within section 538.210 limiting non-economic damages in wrongful death suits do not violate article I, section 22(a) of the Missouri Constitution.

### B. Separation of Powers

Sanders next contends that the damages limitation interferes with the judiciary's performance of its constitutionally assigned power to render judgments in conformity with the jury's verdict and to enforce judgments upon the verdict because it prevents the collection of the amount of damages that the jury found to be fair and appropriate.[9]

Article II, section 1 of the Missouri Constitution reads:

The powers of government shall be divided into three distinct departments—the legislative, executive and judicial—each of which shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances in this constitution expressly directed or permitted.

"It is difficult to point out the precise boundary which separates legislative from

---

8. In fact, the original statute establishing the cause of action placed a $5,000 limit on damages. *See* Rev. Stat. ch. 51, sec. 4 (1855).

9. The argument that the legislature is intruding on the power accorded to the jury's verdict when entering judgment is tied closely with the previously rejected notion that the right to jury trial has been violated.

judicial duties.... The authority that makes the laws has large discretion in determining the means through which they shall be executed." *DeMay*, 37 S.W.2d at 650 (citation omitted).

■ In adopting this statute, the General Assembly created the law through which the wrongful death cause of action operates. The fact-finder—whether judge or jury—makes a factual determination when returning its verdict. The judge then enters judgment by applying the law to the fact-finder's determination. The limit on damages within section 538.210 interferes neither with the jury's ability to render a verdict nor with the judge's task of entering judgment; rather, it informs those duties. *Compare Overbey*, 361 S.W.3d at 383 (holding that limits on punitive damages placed on statutory causes of action do not violate separation of powers), *with Fust v. Attorney General*, 947 S.W.2d 424, 430–31 (Mo. banc 1997) (holding that limits on punitive damages in common law causes of action do not violate separation of powers). The remedy available in a statutorily created cause of action is "a matter of law, not fact, and not within the purview of the jury." *Adams*, 832 S.W.2d at 907. To hold otherwise would be to tell the legislature it could not legislate; it could neither create nor negate causes of action, and in doing so could not prescribe the measure of damages for the same. This Court never has so held and declines to do so now. The General Assembly has the right to create causes of action and to prescribe their remedies. The General Assembly may negate causes of action or their remedies that did not exist prior to 1820. The judiciary has the duty to prescribe the trial process and to protect those rights to jury trial as existed prior to 1820. Mo. Const. art. I, sec. 22(a); art. II, sec. 1.

## IV. Defendants' Points on Cross–Appeal

### A. Periodic Payments

#### 1. Constitutionality for wrongful death

Defendants argue that the trial court erred in refusing to order that future damages be made in periodic payments pursuant to section 538.220. Sanders responds that section 538.220 is unconstitutional because it violates a number of Missouri's constitutional provisions: article I, section 22(a) (infringing upon the right of trial by jury); article II, section 1 (separation of powers); article I, section 26 (taking of private property without just compensation); and article III, section 40(28) (prohibition against special laws).

■ As discussed in Part III, the legislature may define remedies for statutory causes of action. Section 538.220 does not violate the right to trial by jury, at the very least, in relation to periodic payments of damages for wrongful death claims.

■ Nor does section 538.220 violate the principle of separation of powers. The statute is simply a limitation on a remedy. As reaffirmed above, the legislature may place limits on statutorily created remedies.[10]

■ The other points Sanders raises— the taking of private property for public use without just compensation (article I, section 26) and the prohibition against special laws (article III, section 40(28))—were not raised at the first opportunity and, thus, were waived. *See Hollis v. Blevins*, 926 S.W.2d 683, 684 (Mo. banc 1996). Unlike the trial by jury and separation of

---

**10.** This Court in *Fust* held that limitations on common-law remedies do not implicate separation of powers. 947 S.W.2d at 430–31. We see no reason to disturb that opinion.

powers issues, these latter points were raised only after the civil trial had concluded.

2. No error in denying periodic payments

The Court next determines whether the trial court abused its discretion in refusing to grant periodic payments of future damages. "The provisions of section 538.220 give the circuit court, in the absence of a court-approved settlement between the parties, discretion in establishing the plan for future payments—with two exceptions." *Vincent by Vincent v. Johnson,* 833 S.W.2d 859, 866 (Mo. banc 1992). "First, all past damages must be paid in a lump sum at the time of judgment." *Id.* (citing section 538.220.1). "Second, it is presumed that, absent the attorney's agreement, attorney's contingent fees will be paid at the time of judgment." *Id.* (citing section 538.220.4). "The statute does not require any other amounts to be apportioned to future payments." *Id.*

The jury's verdict designated $7.5 million in future non-economic damages and $1.7 million in past non-economic damages. The application of section 538.210.1 reduced the amount of recoverable non-economic damages to $632,603.82 per defendant, totaling $1,265,207.64. As the amount of non-economic damages recoverable after applying the caps is less than the total amount of past non-economic damages determined by the jury, it is within the discretion of the trial court to assign the entire $1,265,207.64 as past non-economic damages. Defendants' point is denied.

## B. Directed Verdict

Defendants made a motion for directed verdict "on the issue of vicarious liability" at the close of Sanders's evidence. At the close of all evidence, Defendants made a motion for directed verdict on the issue of causation as well as vicarious liability. After trial, Defendants moved for judgment notwithstanding the verdict ("JNOV") on the issue of causation. Sanders believes that a proper motion for directed verdict following plaintiff's evidence is required to preserve the availability of JNOV—regardless of whether a motion for directed verdict is filed at the close of all evidence. Defendants claim that to preserve for JNOV, a motion for directed verdict need only be made at close of all evidence.

### 1. Timing of directed verdict motion

Rule 72.01 governs motions for directed verdict and for judgment notwithstanding the verdict:

(a) *Motion for Directed Verdict: When Made: Effect.*

A party may move for a directed verdict at the close of the evidence offered by an opponent. The filing of such motion does not constitute a waiver of movant's right to offer evidence to the same extent as if the motion had not been made. A motion which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor . . . .

(b) *Motion for Judgment Notwithstanding the Verdict.*

A party may move for a directed verdict at the close of all the evidence. . . . Not later than thirty days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the motion for a directed verdict. . . . A motion for a new trial may be joined with this motion,

or a new trial may be prayed for in the alternative. . . .

Conflict exists as to whether a party must move for directed verdict both at the close of the opposing party's evidence and again at close of all evidence, or whether a sole motion at close of all evidence suffices to preserve the issue. The court of appeals has stated that "[t]o preserve the question of submissibility for appellate review in a jury-tried case, a motion for directed verdict must be filed at the close of the plaintiff's case and again at the close of all evidence." *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 18 (Mo.App.2004) (citations omitted). This conflicts with an earlier statement by that court:

> If [a] moving party presented no evidence, then the required motion is made at the close of plaintiff's evidence. If, however, the moving party presents evidence, the moving party waives any trial court error in denying the motion filed at the close of plaintiff's case.
>
> If the moving party, as here, presented evidence, the required motion for a directed verdict must be made at the close of all the evidence. Failure to file such a motion waives a contention that plaintiff failed to make a submissible case.

*Schnatzmeyer v. Nat'l Life Ins. Co.*, 791 S.W.2d 815, 819 (Mo.App.1990).

▆▆▆▆ Rule 72.01 provides the procedure for challenging the submissibility of plaintiff's case. It does not, however, state what is required to preserve that issue for appeal. Generally, the requirement that an issue be preserved is based on ideas of efficiency and fair play. A party should make any objection to the trial process at the earliest opportunity to allow the other party to correct the problem without undue expense or prejudice. Having been informed of the objection, the opposing party can choose to eliminate the complaint or may stand his or her ground and risk reversal on appeal. Likewise, if a party fails to make an objection when the concern can be corrected at the earliest and easiest opportunity, he or she will not be heard to complain later when the cost of correction may be far more onerous.

When applying this rationale to motions for directed verdict, consideration must be given to the decisions made at different stages during the trial: at the close of plaintiff's evidence and at the close of all evidence. At the close of plaintiff's evidence, Rule 72.01(a) provides defendant with the opportunity to challenge whether plaintiff has made a submissible case. If no further evidence is introduced, the case—both at trial and on appeal—is determined by the evidence on the record at that point. Should the trial court overrule the motion, defendant then has the choice of putting on evidence of his or her own. If defendant introduces evidence, the state of the record at the close of plaintiff's case is waived and the case—both at trial and on appeal—is determined in accordance with all evidence admitted: plaintiff's *and* defendant's. Rule 72.01(b) allows defendant the opportunity to move for a directed verdict at the close of all evidence.

▆▆▆▆ In terms of preservation, a motion for directed verdict at the close of plaintiff's case is necessary only if defendant seeks to have the case determined at that point without introduction of additional evidence. Alternatively, if defendant chooses to put on evidence, the state of the record changes. The case then is decided on all of the evidence. A motion for directed verdict at the close of all evidence becomes the meaningful motion to preserve the issue as it presented itself to the trial court at that time, prior to submission to the jury. After verdict, of course, a motion for JNOV also is required to pre-

serve the issues raised for appeal. *See* Rule 72.

## 2. Specificity of Defendants' motion

■ Sanders next claims that Defendants failed to make their motion for directed verdict with requisite specificity. Defendants' oral motion stated, "We think plaintiff failed to make a submissible case on issues of negligent causation. . . ." Rule 72.01 requires that a motion for directed verdict "state the specific grounds therefore." Defendants stated the grounds for their motion, i.e., the failure to show causation. The motion might have been more specific but was sufficient to preserve the issue.

## 3. Merits of Defendants' motion

■ The standard for reviewing a denied motion for JNOV is essentially the same as for reviewing the denial of a motion for directed verdict. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456 (Mo. banc 2006). A case may not be submitted unless legal and substantial evidence supports each fact essential to liability. *Id.* at 456–57. The court views the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict. *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000). A court may reverse the jury's verdict for insufficient evidence only when there is a complete absence of probative fact to support the jury's conclusion. *Investors Title Co., Inc. v. Hammonds*, 217 S.W.3d 288, 296 (Mo. banc 2007).

■ To make a submissible case in a wrongful death suit, a plaintiff must show that the negligence of the defendant "directly caused" or "directly contributed to cause" the patient's death.[11] *Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299, 306 (Mo. banc 2011). Missouri requires a showing of two types of causation: "but-for" causation and "proximate" causation. *Callahan*, 863 S.W.2d at 863, 865. "In a medical malpractice case, where proof of causation requires a certain degree of expertise, the plaintiff must present expert testimony to establish causation." *Sundermeyer*, 271 S.W.3d at 554.

■ Sanders relied on his expert, Dr. Richard Bonfiglio, to establish causation. Dr. Bonfiglio testified that, although there were other contributing factors, including seizures and the temporary loss of oxygen to Ms. Sanders's brain, "[i]t's quite clear from the record that [Ms. Sanders's] brain injury was caused by the elevated ammonia level." Defendants cite to those contributing factors, as well as facts that Ms. Sanders was in a coma and that she did not die until two years later, for the proposition that Dr. Bonfiglio's expert opinion was speculative and not supported by the evidence in the record. Defendants' argument fails, because it confuses the admissibility of Dr. Bonfiglio's opinion testimony with the issue of submissibility of a plaintiff's case.

■ In *Washington v. Barnes Hospital*, this Court discussed the distinction between admissibility of expert opinion testimony and the submissibility of a plaintiff's case in reliance thereon. 897 S.W.2d 611, 616 (Mo. banc 1995). "If a question

---

11. "[A] causation analysis should not lose sight of the ultimate issue: . . . 'under MAI we do not use the terms 1) "proximate cause," 2) "but for causation," or 3) "substantial factor" when instructing the jury. We merely instruct the jury that the defendant's conduct must "directly cause" or "directly contribute to cause" plaintiff's injury.' " *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 555 (Mo. banc 2008) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863 (Mo. banc 1993)).

exists as to whether the proffered opinion testimony of an expert is supported by a sufficient factual or scientific foundation, the question is one of admissibility. It must be raised by a timely objection or motion to strike." *Id.* "Once opinion testimony has been admitted, as other evidence, it may be relied upon for purposes of determining the submissibility of the case." *Id.* (citing *Goodman v. Allen Cab Co.*, 360 Mo. 1094, 232 S.W.2d 535, 539 (1950)). The jury then considers the natural probative effect of the opinion testimony. *Id.* (citing *De Moulin v. Roetheli*, 354 Mo. 425, 189 S.W.2d 562, 565 (1945)).

■■■ Defendants in this case did not challenge the scientific or factual foundation of Dr. Bonfiglio's opinion or otherwise object during Dr. Bonfiglio's testimony. "[A]n objection or motion to strike is untimely if it comes 'too late to give opposing counsel an opportunity to correct any deficiencies in the questions or lay an appropriate foundation for the witness's opinion.'" *Id.* (quoting *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 209 (Mo. banc 1991)). By failing to both timely object and move to strike, Defendants waived any issue regarding the admissibility of Dr. Bonfiglio's opinion testimony.

■■■ In wrongful death actions, a plaintiff must establish that "but for" the defendant's actions or inactions, the patient would not have died. *Sundermeyer*, 271 S.W.3d at 554. But-for causation is also known as "causation in fact." *Washington*, 897 S.W.2d at 617 n. 2. This Court has explained:

> The general rule is that if a defendant is negligent and his [or her] negligence combines with that of another, or with any other independent, intervening cause, he [or she] is liable, although his [or her] negligence was not the sole negligence or the sole proximate cause, and although his [or her] negligence,

without such other independent intervening cause, would not have produced the injury.

*Id.* at 554–55 (alterations in original) (quoting *Harvey v. Washington*, 95 S.W.3d 93, 96 (Mo. banc 2003). "Two causes that combine can constitute 'but for' causation." *Harvey*, 95 S.W.3d 93, 96 (citation omitted)).

■■■ Dr. Bonfiglio testified that Ms. Sanders experienced seizures while in a coma on May 27; Ms. Sanders also aspirated vomit into her lungs, which caused oxygen deprivation to her brain. Dr. Bonfiglio testified that Dr. Ahmed prescribed Depakote, which increases the amount of ammonia present in the body. Dr. Bonfiglio opined that Dr. Ahmed was negligent in not ordering a test to determine the amount of ammonia present in Ms. Sanders's body, in continuing to prescribe Depakote, and in failing to prescribe Lactulose (an ammonia-flushing laxative). Dr. Bonfiglio testified about the effects of Depakote and its byproduct ammonia on Ms. Sanders:

> [A]dding more Depakote to somebody who already is having seizures, is in a coma already, has an elevated ammonia level, it's like trying to put out a fire with gasoline. It's just the worst possible thing you can do is to give more Depakote, further raising the ammonia level and prolonging how long the brain is going to be exposed to ammonia.

> [Ammonia] causes the brain to swell. It interferes with brain function. If the brain is exposed to ammonia long enough, it actually causes the brain cells to die and it can cause a severe brain injury as it did in this case.

Dr. Bonfiglio concluded:

> It's quite clear from the record that her brain injury was caused by the elevated ammonia level. It stayed elevated for

days. There were other contributing factors.... [These] increased the risk of insult to her brain.

. . .

Bottom line, its most serious effect on her was the elevated ammonia level from Depakote that caused her very profound brain injury....

. . .

... [U]nfortunately, she had a number of medical complications that are known in individuals that suffer brain injury. She had ... aspiration pneumonia. There was also an infected hip ... [which], when you have a brain injury like this, [is] one of the things that can happen.... She also had blood clots that developed, including a clot that went to her lung. The medical term for that is pulmonary embolism. She has had quite a number of complications of this severe brain injury and ... she ended up dying as a consequence of her brain injury.

. . .

My opinion is that the ... substandard care provided by Dr. Ahmed did directly contribute to the patient subsequently developing complications that led to her death. It took some time, but it was a direct consequence of the care he provided.

Dr. Bonfiglio testified that Dr. Ahmed should have stopped prescribing Depakote and should have prescribed Lactulose to bring down Ms. Sanders's ammonia level. Dr. Bonfiglio stated unequivocally that, in his expert opinion, Dr. Ahmed's substandard care directly contributed to Ms. Sanders's death. Reviewing this evidence in the light most favorable to the jury's verdict, there was legal and substantial evidence of "but for" causation.

▮▮▮▮▮ Proximate causation "requires something in addition to a 'but for' causa-tion test because the 'but for' causation test serves only to exclude items that are not causal in fact." *Callahan*, 863 S.W.2d at 865. Missouri courts "have generally said that the injury must be a reasonable and probable consequence of the act or omission of the defendant." *Id.* "This is generally a 'look back' test but, to the extent it requires that the injury be 'natural and probable,' it probably includes a sprinkling of foreseeability." *Id.* "To the extent the damages are surprising, unexpected, or freakish, they may not be the natural and probable consequences of a defendant's actions." *State ex rel. Missouri Highway & Transp. Comm'n v. Dierker*, 961 S.W.2d 58, 61 (Mo. banc 1998) (citation omitted). When a physician or nurse acts negligently in the treatment of a patient, later harm arising from that injury is naturally foreseeable. *Callahan*, 863 S.W.2d at 865–66.

Defendants argue that there is an absence of probative fact from which a jury could find for Sanders. Defendants believe they have found persuasive precedent in *Delisi v. St. Luke's Episcopal–Presbyterian Hosp., Inc.*, 701 S.W.2d 170 (Mo.App. 1985). In *Delisi*, the defendant doctor's treatment of the plaintiff's hand wound did not include prophylactic antibiotics; the wound later became infected. *Id.* at 172. The plaintiff adduced no expert testimony that antibiotics would have prevented the ensuing infection. *Id.* Instead, the plaintiff relied on the circumstantial evidence that 1) he had not received antibiotics initially and 2) antibiotics later cured the infection. *Id.* at 176. The court held that, because the therapeutic properties of antibiotics are beyond the realm of knowledge for an average juror, submitting to the jury on circumstantial evidence alone "would inevitably lead the jurors into the forbidden realm of conjecture and surmise." *Id.*

This case is distinguishable from *Delisi* in that Sanders did present direct evidence of causation by eliciting testimony from Dr. Bonfiglio. Dr. Bonfiglio testified that the normal range for an ammonia level is 0 to 37, and on May 27, Ms. Sanders registered an ammonia level at 181, a "very dangerous" level. He stated that had the ammonia level been reduced by administering Lactulose and by ceasing Depakote, Ms. Sanders would have had a much better outcome. He opined that it was "the elevated ammonia level from Depakote that caused her very profound brain injury. . . ." Dr. Bonfiglio affirmed, "My opinion is that the . . . substandard care provided by Dr. Ahmed did directly contribute to the patient subsequently developing complications that led to her death."

It cannot be said that there is a complete absence of probative fact regarding the element of causation. *See Edgerton v. Morrison,* 280 S.W.3d 62, 69–70 (Mo. banc 2009). Sanders made a submissible case for the jury.

## C. Improper Argument

■ Defendants' next assignment of error concerns the trial court's refusal to grant a mistrial upon allegedly improper comments made by Sanders's counsel during closing argument. Specifically, Defendants argue that counsel's statements were designed to ask the jury to send a message to Dr. Ahmed and to deter other doctors from like conduct by arguing for punitive damages.

At the beginning of his closing, Sanders's counsel stated, without drawing objection: "I told you this case could have significance beyond this courtroom, actually beyond this city. It could affect this whole region. It could affect this whole country." Twenty-two pages later in the transcript, counsel said, "As I said, I think the range is anywhere from $5 to $26

million is fair in this case. I think that's what you've got to do, because a doctor like this isn't going to get the word. He isn't going to understand." Defendants' counsel objected, citing improper argument, and the court sustained the objection. Defendants' counsel made no further request for relief.

It "has repeatedly been held that when the trial court sustains an objection to improper argument, and no further remedial action is requested, no error is preserved for appellate review." *Olsten v. Susman,* 391 S.W.2d 328, 330 (Mo. 1965). Defendants' point is denied.

## D. Reduction under 537.060

■ Defendants finally allege the trial court erred in denying Defendants' motion for reduction. Section 537.060 permits a defendant's liability to be reduced by the amounts of settlements with joint tortfeasors. *Teeter v. Mo. Highway & Transp. Comm'n,* 891 S.W.2d 817, 820 (Mo. banc 1995). Section 537.060 provides in part:

> When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however, such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater.

■ "A reduction under section 537.060 is a satisfaction of an amount owed . . . and must be pleaded and proved as an affirmative defense." *Norman v. Wright,* 100 S.W.3d 783, 785 (Mo. banc 2003). The defendant bears the burden of pleading and proving the elements of the defense. It is uncontested that reduction requires a defendant to plead and prove 1) the exis-

■■■■ of a settlement and 2) the stipulated amount of the agreement or the amount in fact paid. The parties disagree as to who bears the burden of proving that a settling party was jointly liable for the same injury or wrongful death.

■■■■ Joint and several liability occurs "where the concurrent or successive negligent acts or omissions of two or more persons, although acting independently of each other, are, in combination, the direct and proximate cause of a single injury to a third person, and it is impossible to determine in what proportion each contributed to the injury." *Glick*, 396 S.W.2d at 613 (Mo. 1965), *overruled on other grounds by Bennett*, 896 S.W.2d 464. This situation can be distinguished from one in which an injury occurs and the negligence of a third party aggravates the initial injury. In such a situation, the third party would be liable only for the damage attributable to the aggravation and not for the initial injury. *See State ex rel. Baldwin v. Gaertner*, 613 S.W.2d 638, 640 (Mo. banc 1981).

Sanders argues that for Defendants to receive reduction, they must plead and prove a medical malpractice action against each settling defendant for whose payment they claim a reduction. The cases Sanders cites for this proposition do not support his reading of the statute.

In *Stevenson v. Aquila Foreign Qualifications Corp.*, 326 S.W.3d 920, 928 (Mo. App.2010), the court stated that "a non-settling tortfeasor who claims a settlement affords a right to reduction under section 537.060 bears the burden of proving it had joint liability with the settling tortfeasor, a burden which is not met by the fact that a plaintiff has merely claimed joint liability." (emphasis omitted). In *Stevenson*, the plaintiff was injured in an automobile colli-

sion by one set of defendants who later settled. *Id.* at 923. Three years later, the plaintiff's injuries were aggravated in a second automobile collision with the trial defendants. *Id.* Under the facts as pleaded, a jury could not find both sets of defendants jointly liable, as the injuries for which the trial defendants were sued were divisible from those governed by the settlement. *Id.* at 928. Because the plaintiff's pleadings could not establish joint liability, the burden of proving that element remained on the non-settling defendant. *Id.*

In *Walihan v. St. Louis–Clayton Orthopedic Group, Inc.*, 849 S.W.2d 177, 180 (Mo.App.1993), the court held that the defendants had failed to plead facts sufficient for summary judgment on section 537.060 reduction. In that case, the decedent was injured working for his Illinois employer and later received negligent medical treatment by a Missouri doctor and hospital, resulting in death. *Id.* at 179. The executrix sued the Illinois defendants in Illinois and sued the Missouri defendants in Missouri. *Id.* The Illinois defendants settled two causes of action—one for the underlying workplace injury and one for the ensuing death.[12] *Id.* at 180–81. The Missouri suit included only damages related to wrongful death. *Id.* at 181. The Missouri defendants sought reduction and provided evidence of the total amount of the Illinois settlement. *Id.* at 181. The settlement applied to multiple claims, of which the Missouri defendants were only liable for damages related to wrongful death. *Id.* Thus, a court could not determine without further inquiry the consideration paid to settle the wrongful death claim. *Id.* The court of appeals, therefore, overturned the trial court's application of reduction by the entirety of the settlement and remanded

**12.** Illinois permitted recovery for both wrongful death and damages incurred prior to

death. *See* Ill. Comp. Stat., ch. 110 1/2, para. 27–6 (Supp.1992).

for a determination of the settlement amount attributable to wrongful death. *Id.*

 The burden of proof is on the party seeking reduction. For the purposes of statutory reduction, a rebuttable presumption of joint liability for the same injury or wrongful death can arise from the plaintiff's pleadings and ensuing settlement. Once that presumption arises, it falls to the plaintiff to show that the injuries are divisible. This interpretation fits with the purpose of section 537.060 to implement the common law rule that a plaintiff is entitled to only one satisfaction for the same wrong. *See State ex rel. Normandy Orthopedics, Inc., v. Crandall*, 581 S.W.2d 829, 832 n. 1 (Mo. banc 1979).

Here, Sanders sued settling defendants Kansas City University of Medicine and Biosciences, Carol E. Kirila and Midwest Division M.C.I., LLC. Sanders also sued non-settling defendants Dr. Ahmed and Dr. Iftekhar Ahmed P.A., among others. In his third amended pleading, Sanders alleged:

> As a direct and proximate consequence of the acts, omissions and conduct of the defendants set out herein, Paulette Sanders developed an elevation in her serum ammonia level, ... which in turn caused her to become bedridden, physically disabled and mentally incapacitated, the complications of which ultimately directly caused or directly contributed to cause her death on August 24, 2005.

In this pleading, Sanders alleges joint and several liability. When combined with the later settlement between some of these defendants and Sanders, such a pleading suffices to raise a rebuttable presumption that the settlement and suit pertained to the same injury or wrongful death for the purposes of section 537.060.

Given the existence of that presumption, the burden still falls to Defendants to plead and prove the existence and applicability of the settlement and the amount paid thereunder. The trial court held Defendants' motion for discovery of the settlement terms in abeyance until the close of the trial. Although Defendants pleaded that Sanders had settled, the trial court's denial of discovery frustrated their ability to do anything further.

 Trial courts have broad discretion in administering rules of discovery, which this Court will not disturb absent an abuse of discretion. *State ex rel. Delmar Gardens N. Operating, LLC v. Gaertner*, 239 S.W.3d 608, 610 (Mo.2007) (citing *State ex rel. Plank v. Koehr*, 831 S.W.2d 926, 927 (Mo. banc 1992)). However, "a trial court has no discretion to deny discovery of matters that are relevant to a lawsuit and are reasonably calculated to lead to the discovery of admissible evidence when the matters are neither work product nor privileged." *State ex rel. BNSF Ry. Co. v. Neill*, 356 S.W.3d 169, 172 (Mo. banc 2011) (internal quotation marks and punctuation omitted). Here, the discovery of the settlement terms was crucial to Defendants' affirmative defense of reduction, and the discovery denial prejudiced their ability to plead and prove that defense. Within this context, it would be an injustice to hold that Defendants are precluded from a reduction because of their failure to plead and prove what the trial court withheld from them.[13]

 Sanders's pleading of joint and several liability along with the existence of a settlement with named defendants raises

---

13. Neither party has argued whether this issue is one that must be submitted to the jury or may be resolved by the court after the verdict is returned. We decline to rule on this issue *sua sponte.*

the presumption that the settlement was for the same injury as recovered under the jury's verdict. The statutory cap reduced the recoverable non-economic damages from $9.2 million to $1,265,207.64. The total settlement compensation is less than the difference between the verdict and the cap. However, Sanders's pleadings sought both non-economic and economic damages. Insofar as the settlements included economic damages, the cap will not obviate statutory reduction. Accordingly, a question also exists as to whether Sanders receives a double recovery of economic damages.

## V. Conclusion

The judgment is affirmed in all respects except as to reduction under section 537.060. The judgment with respect to that section is reversed, and the case is remanded.

RUSSELL, BRECKENRIDGE, FISCHER and STITH, JJ., concur.

DRAPER, J., dissents in separate opinion filed.

TEITELMAN, C.J., concurs in opinion of DRAPER, J.

GEORGE W. DRAPER III, Judge, dissenting.

The principal opinion recognizes that the state constitutional right to a trial by jury applies to Sanders' claim for wrongful death. The principal opinion then holds that the statutory cap on non-economic damages does not violate Sanders' right to a jury trial because the legislature could have precluded recovery of non-economic damages completely. When the constitutional right to a jury trial attaches, it is beyond the reach of hostile litigation. Therefore, I respectfully dissent from the principal opinion's holding that the statutory cap on non-economic damages does not

violate the "inviolate" constitutional right to a trial by jury.

The Missouri Constitution plainly states, "That the right of trial by jury as heretofore enjoyed shall remain inviolate...." Mo. Const. art. I, sec. 22(a). "Inviolate" is defined as "free from change or blemish, pure or unbroken." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1190 (1993). The definition of "inviolate" frames the issue. "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935). It is impossible for the right to a trial by jury to "remain inviolate" when a statutory limit requires the reduction of the jury's verdict regardless of the particularized facts of each case.

The special constitutional significance of the jury's role in determining damages is reflected in the analytical basis for determining whether the right to trial by jury attaches. The principal opinion finds that the constitutional right to a trial by jury only attaches to common law actions that existed before the constitution's adoption in 1820, citing *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898, 907 (Mo. banc 1992). However, the reasoning set forth in Adams and followed by the principal opinion is flawed. Adams allows the legislature to modify or abolish causes of action by statute. *See Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 773 (Mo. banc 2010) (J. Wolff, concurring). If this maxim is absolute, then the legislature could abolish common law actions and then reenact them as statutory actions with dramatic limitations on damages.

Obviously, this is not the law. If the action is a civil action for damages, then

the right to a jury trial attaches and must "remain inviolate." *State ex rel. Diehl v. O'Malley,* 95 S.W.3d 82, 84 (Mo. banc 2003). The principal opinion recognizes that Sanders' wrongful death claims were heard properly by a jury. "The right to trial by jury ... is a constitutional right, [and it] applies 'regardless of any statutory provision,' and is 'beyond the reach of hostile legislation.'" *Id.* at 92 (quoting *Lee v. Conran,* 213 Mo. 404, 111 S.W. 1151, 1153 (Mo. 1908)).

Because the constitutional right to a civil jury trial attaches in this case, statutory limits imposed on the jury's determination of damages directly curtails one of the most significant constitutional roles performed by the jury. Section 538.210 nullifies the jury's finding of fact regarding the amount of damage actually suffered by the plaintiff by requiring the court to reduce a non-economic damages award determined by a jury that exceeds the statutorily imposed limit. This undermines one of the jury's most basic functions and the plaintiff's right to a trial by jury. *See Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt,* 286 Ga. 731, 691 S.E.2d 218, 223 (2010); *Moore v. Mobile Infirmary Ass'n,* 592 So.2d 156, 164 (Ala.1991). If the jury's particularized damage determination is disregarded, this Court merely pays "lip service to the form of the jury by rob[bing] the institution of its function." *Sofie v. Fibreboard Corp.,* 112 Wash.2d 636, 771 P.2d 711, 721 (1989).

Further, the cap on non-economic damages also violates the separation of powers.

The statutory cap on non-economic damages encroaches on the judicial prerogative of remittitur in determining whether the jury's assessment of damages is appropriate on a case-by-case basis.[1] As an institutional body, the legislature is not in a position of being able to make this particularized determination, and this violates the separation of powers. *See Sofie,* 771 P.2d at 721, *Best v. Taylor Mach. Works,* 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1081 (1997), *Lebron v. Gottlieb Mem'l Hosp.,* 237 Ill.2d 217, 341 Ill.Dec. 381, 930 N.E.2d 895, 914 (2010).

Our constitution "deals with substance, not shadows.... If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." *Cummings v. Missouri,* 71 U.S. 277, 325, 4 Wall. 277, 18 L.Ed. 356 (1866). Therefore, I would hold that the cap on non-economic damages as enunciated in section 538.210 represents an impermissible burden on the inviolate right to a trial by jury as guaranteed by article I, section 22(a) of the Missouri Constitution and the separation of powers as guaranteed by article II, section 1 of the Missouri Constitution.

---

1. The common law right of remittitur has been established since Justice Story's opinion in 1822. *Blunt v. Little,* 3 F.Cas. 760, 761 (C.C.D.Mass.1822). The United States Supreme Court accepted Justice Story's vision uncritically. *See N. Pac. R. Co. v. Herbert,* 116 U.S. 642, 643, 6 S.Ct. 590, 29 L.Ed. 755 (1886) and *Linn v. United Plant Guard Workers of Am., Local 114,* 383 U.S. 53, 64, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). This Court relinquished the common law right to remittitur in *Firestone v. Crown Ctr. Redevelopment Corp.,* 693 S.W.2d 99 (Mo. banc 1985). Acting in the void of *Firestone,* the legislature statutorily enacted section 537.068, reinstating remittitur and granting authority for the additur.