Thomas H. Newton, Judge
The Kansas City Board of Police Commissioners (Board) appeals a Jackson County Circuit Court judgment awarding damages to Mr. Antoine Moody who was injured by a drunk driver when an early morning police pursuit ended near Troost and 75th Street in Kansas City. The Board contends that proximate cause under these circumstances cannot be shown as a matter of law, the officers' pursuit was not negligent, they did not breach any duty to Mr. Moody, and the trial court erred in submitting a verdict director to the jury not requiring the jury to find that the officers acted unreasonably. Mr. Moody has filed a cross-appeal, challenging the trial court's decision to offset or credit certain settlement amounts from the jury's $1 million verdict, and the court's grant of summary judgment on his theory that the police were responsible for creating a dangerous condition on public grounds. We affirm.
Kansas City Police Sergeant Tamara Pronske saw the driver of a silver sport utility vehicle (SUV) speed through a red light in the early morning hours of January 14, 2012.[1] She knew she would lose sight of it if she tried to pursue the vehicle, so she called it in, reporting her belief that the driver was intoxicated.[2] About ten minutes later, Police Officer Scott Brulja and his partner Matt Sevier saw a vehicle speed through a red light at some distance from where Sergeant Pronske had spotted the SUV and followed it with their police vehicle's lights and siren activated. Their report of the SUV over the police radio caught Sergeant Pronske's attention, and she concluded and *788 reported that it was the same vehicle. Officer Brulja observed the SUV having difficulty maintaining its lane of travel and speeding through stop signs and lights before he lost sight of it. He and his partner, who also reported the driver as possibly intoxicated, then spent the next fifteen minutes driving through nearby residential neighborhoods, spotlighting driveways and looking to see if the SUV had parked anywhere. At one point they commented, "Damn, Dude, we almost had us one," and "We could have chased him."
When they relocated the SUV, it was parked near an intersection. The officers saw the driver's hand and leg outside the fully opened driver's door. Before the driver could exit the SUV, the officers shone a spotlight on the vehicle and his face, alerting him to their presence. The driver pulled away at high speed. The officers reported the SUV's make and model, as well as the license plate information, to the police dispatcher. Reaching 80 to 100 miles per hour, a pursuit ensued after 3:15 a.m., during which the SUV driver continued to run through red lights and stop signs and swerve out of his lane of travel, nearly running at least two other vehicles off the road. Officer Brulja and his partner were in communication with a supervising officer, relaying information about speed, road conditions, and other factors critical to a decision about whether a pursuit should be terminated. Some discrepancies between their actions/observations and their communications were shown during trial, including speed, icy road conditions, and risks to other drivers who were on the streets at that hour. Officer Brulja was not instructed to stop, and he decided not to abandon the pursuit. In coordination with Officer Brulja, who relayed information about his location and speed, and a supervising officer, other responding officers deployed "stop sticks," or tire-deflation devices, in a commercial area, which was in the SUV driver's anticipated line of travel.[3] When the vehicle hit the stop sticks, the SUV veered, flipped, and crashed into Mr. Moody's vehicle, resulting in serious injuries to Mr. Moody.[4] All Mr. Moody could remember about that night and the accident, which occurred after he left work, was driving in his father's car to his security job at a night club. The evidence showed that he had stopped his vehicle *789 because officers were in the roadway deploying tire-deflation devices to stop the fleeing driver.
Mr. Moody brought twenty-four counts against a number of defendants, focusing primarily on the alleged negligence of police officers in deploying stop sticks to end a pursuit under the circumstances.[5] He also alleged negligence on Officer Brulja's part in initiating a "second chase" knowing that the SUV driver, when or if not chased, "had [stopped] and likely would stop and pose no further danger to the public." Mr. Moody alleged that Officer Brulja was also negligent in failing to discontinue the pursuit "when it became apparent that chasing the vehicle created a danger to the public greater than would exist if the chase were to be discontinued." Counts against individual police officers were dismissed voluntarily or by summary judgment, and a number of counts were resolved through settlements purportedly totaling $600,000. The docket shows that the stop-stick manufacturer was voluntarily dismissed the day before the trial court entered its summary-judgment order, and it is unclear whether the court was aware, when its order was filed, that the manufacturer's alleged liability had been resolved out of court. Despite the manufacturer's absence from trial, Officer Brulja testified briefly about the deployment of stop sticks as part of the responding officers' "team" effort to stop the pursued SUV. The only count remaining at trial was negligence/agency against the Board, and the case was submitted to the jury with a verdict director focusing on Officer Brulja's alleged negligence either in initiating a pursuit when the driver of the pursued vehicle "did not pose a sufficient danger to the public" or in failing "to discontinue the pursuit ... when the danger to the public outweighed any benefit to pursuing [the vehicle]." The jury awarded Mr. Moody $1 million, which the court reduced to offset the settlement amounts. The court denied the Board's motion for new trial and Mr. Moody's motion to amend the judgment to omit the offset or credit. This appeal and cross-appeal followed.
Legal Analysis
The Board's Appeal
In the first point, the Board asserts that the trial court erred in submitting Mr. Moody's negligence claim to the jury and denying its motion for judgment notwithstanding the verdict, because, as a matter of law, the proximate cause of Mr. Moody's injuries was the erratic driving of the drunk driver, Mr. Jamel Fields, who was driving the SUV that crashed into Mr. Moody's car. In this regard, the Board cites a number of cases that it claims support its categorical assertion before this Court that police are never responsible for injuries resulting from a collision with a vehicle driven by a fleeing suspect. See, e.g., Stanley v. City of Independence , 995 S.W.2d 485, 488 (Mo. banc 1999) ; Oberkramer v. City of Ellisville , 706 S.W.2d 440, 442 (Mo. banc 1986) ; Frazier v. City of Kansas City , 467 S.W.3d 327, 337 (Mo. App. W.D. 2015) ; and Dilley v. Valentine , 401 S.W.3d 544, 549 (Mo. App. W.D. 2013). In none of these cases, however, did the issue of negligence go before a jury. Our supreme court recognized in Stanley that officers' negligence during a pursuit could be the proximate cause of injury resulting from a collision between the plaintiffs and the pursued vehicle, depending on the "fact situations."
*790 Stanley , 995 S.W.2d at 488 (citing Cannada v. Moore , 578 S.W.2d 597, 598 (Mo. banc 1979) (affirming a jury's wrongful-death-damages award where police set up a barrier and allegedly failed to warn drivers to get out of the way of a pursued vehicle that crashed into the car in which the decedent was a passenger)). We agree with Mr. Moody that proximate cause, even in police-pursuit cases, is fact specific and, at least in some cases, may be submitted to a jury.
When the trial court denied in part the Board's motion for summary judgment here, it distinguished the facts from Stanley and like cases by stating the following:
True the police cars were some distance behind Fields when he crashed and a police car was not involved in the collision. But, there were two chases of Fields, together lasting around fifteen minutes with the second chase lasting around four minutes starting after Fields was completely stopped. The chase reached high speeds up to 100 miles per hour. Further, unlike the other cases cited by Defendants, officers here chose to deploy a tire deflation device after which Fields' car lost control and hit Plaintiff's car. Under these facts, it cannot be found that compelling evidence establishes the absence of causation as a matter of law. (emphasis added).
The trial court's observation serves as an appropriate distinguishing factor, as Stanley , Frazier , and Dilley turned on the courts' determination before trial that the question of whether the collisions would have been avoided had the officers abandoned the pursuits was based "only on speculation" because no facts showed that the pursued driver's erratic driving may or may not have ended in a crash with an innocent third party had the pursuit ceased. Frazier , 467 S.W.3d at 334-35.
Citing Frazier, 467 S.W.3d at 337, the Board argues that whether proximate cause exists is a "judicial function" and is thus subject to our de novo review as a question of law. City of St. Joseph v. Vill. of Country Club , 163 S.W.3d 905, 907 (Mo. banc 2005). We disagree. In Frazier , the question of causation had been decided by the circuit court on a summary-judgment motion. Frazier , 467 S.W.3d at 334-35. In that case, we reviewed the court's ruling de novo , which means reviewing the record "in the light most favorable to the party against whom judgment was entered" and "according that party all reasonable inferences that may be drawn from the record." Id. at 333.[6] According to this Court, the uncontroverted facts did not support the plaintiff's expert's conjecture-based conclusion that violations of Kansas City Police Department (KCPD)
*791 protocols in pursuing a fleeing suspect caused the suspect's crash into the plaintiff's car at an intersection. Id. at 337. In that sense, the proximate-cause issue was deemed a "judicial function."[7]
Thus, we will instead apply the standard of review following the denial of a judgment notwithstanding the verdict:
When reviewing a circuit court's denial of a judgment notwithstanding the verdict, [t]his [c]ourt must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability. We view "the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." This [c]ourt will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion.
McGhee v. Schreiber Foods, Inc. , 502 S.W.3d 658, 666 (Mo. App. W.D. 2016) (citations omitted).
To hold the Board responsible for the misconduct of its police officers acting within the course and scope of their employment, Mr. Moody must have suffered damages attributable to the officers' negligence. See Stanley, 995 S.W.2d at 487. "To sue for negligence, a plaintiff must prove: (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach was a proximate cause of the plaintiff's injury." Id. The third element is raised by the Board's first point. "The general test for proximate cause is whether an injury is the natural and probable consequence of the defendant's negligence." Id. at 488. "Each case is decided on its own facts, ... [and p]roximate cause cannot be based on pure speculation and conjecture." Id.
Challenging the evidence of police negligence as it relates to proximate cause, the Board first requests that this Court disregard the testimony of plaintiff's expert, Mr. Charles Drago, as "probative of nothing." It reminds the Court that we discounted Mr. Drago's opinion on police negligence in Frazier , 467 S.W.3d at 337. The Board also seeks to distinguish Moyer v. St. Francois County Sheriff Department , 449 S.W.3d 415 (Mo. App. E.D. 2014), in which a split panel determined that a genuine issue of material fact existed as to causation in a police-pursuit case.
Here, because Mr. Moody could not remember anything about the collision, the events unfolded for the jury through videos from police-vehicle dashboard cameras. Counsel introduced the videos through the expert testimony of Mr. Drago, who was a police officer and instructor in Florida for many years, but now owns a police-consulting business, as well as through the testimony of Officer Brulja. KCPD vehicle-pursuit procedures were also introduced *792 through Mr. Drago's testimony; he provided commentary on the videos, relating each event to different pursuit procedures, which have been adopted so that officers will "recognize and accept that a decision not to pursue may sometimes be the safest and most professional course of action." He concluded that "[t]he officers in this case failed to follow Kansas City Police Department policy as well as what would be the accepted policy anywhere across the country in pursuits."
The Board does not challenge the admission of Mr. Drago's testimony at trial. Instead, it suggests only that Mr. Drago's testimony was not probative on the issue of proximate cause based solely on the argument that his testimony was discounted as insufficient to establish proximate cause in another case. This argument ignores that sufficient evidence establishing a causal relationship between Officer Brulja's pursuit and the suspect's loss of control of his vehicle was demonstrated by the police-vehicle dash cams about which both Mr. Drago and Officer Brulja testified. In light of data recorded by the dash-cam video, Mr. Drago questioned the accuracy of the information communicated by Officer Brulja to his supervisor about speed, road conditions, other traffic, and whether the officers had backed off or were terminating the reinstituted pursuit. The dash-cam evidence suggested that the decision to deploy stop sticks to end the pursuit was based on incomplete information or inaccurate information provided by Officer Brulja. While Officer Brulja did not deploy the stop sticks and his negligence was the focus of the verdict director and the alleged basis for Board's vicarious liability, he testified that he expected the other members of his "team" were getting into position to deploy stop sticks "to slow the vehicle" as the pursuit continued and that he was fully aware that this was the plan ahead of him. On re-direct examination Officer Brulja was asked, "Okay. In that fourth minute, at that time when you knew that your officers were up ahead and that someone had said, can we stick him, had the factors [affecting a decision to terminate the pursuit] changed at all?" Officer Brulja answered, "No, ma'am." As noted above, the dash-cam video showed that Mr. Fields accelerated from about 60 miles per hour to about 100 miles per hour over the course of 20 seconds during which time Officer Brulja did not report that this was occurring until just before the crash. He had conceded on cross-examination that the KCPD tire-deflation-device deployment policy indicated that stop sticks cause a "rapid" release of air when struck. It would not have been unreasonable for jurors to conclude that the natural and probable consequence of Officer Brulja's failure to accurately report the SUV driver's speed and acceleration as stop sticks were deployed was the crash that injured Mr. Moody. The evidence was sufficient to go to the jury on whether Officer Brulja's actions, in light of purported violations of police policy, were negligent, and whether Mr. Moody's injury was the natural and probable consequence of that negligence. We also do not have to speculate that the crash may not have occurred if the police had not deployed tire-deflation devices, on the basis of information provided by the officer, in a place where other motorists were present and public safety could not allegedly be assured.
Regarding Moyer , the Board contends that it is inapplicable for three reasons: a decision from the Eastern District is not controlling in the Western District, the case was wrongly decided as indicated by a dissenting opinion, and the facts here are more akin to the facts in Stanley than to *793 the facts in Moyer . We have expressed our "discomfort" with the Eastern District's decision to reverse the trial court's grant of summary judgment in Moyer in Throneberry v. Missouri State Highway Patrol , 526 S.W.3d 198, 212-13 (Mo. App. W.D. 2017), a decision that, like Moyer , has been denied transfer. In Throneberry , we determined that under the facts of the case-multiple abandoned pursuits of a stolen vehicle, a suspect who subsequently carjacked another vehicle and then committed a home invasion, threatening a homeowner with a knife, and a final two-minute chase that ended in a fatal crash-the proximate-cause issue fit within the facts of Stanley and Dilley , making the trial court's grant of summary judgment appropriate. Id. at 200-15. We criticized any attempt to focus on a pursuit's speed and duration to distinguish among such cases, and found the court's assumption in Moyer that "a suspect will eventually stop fleeing if a pursuit is abandoned" would apply to every police pursuit. Id. at 211. The suspect in Throneberry was observed driving recklessly before any pursuit began, so we appropriately concluded that proximate cause could not be established. Id. at 213-14. It is clear, however, that the case at bar does not fit neatly within this framework, as the jury could reasonably find that the stop sticks deployed on the basis of potentially misleading information about Mr. Fields's speed were what caused the SUV to veer, flip, and crash into Mr. Moody's vehicle.
The alleged negligence in this case involved police conduct that culminated in the pursued vehicle's encounter with police-deployed tire-deflation devices and consequent loss of control. The circuit court did not err in submitting the question of proximate cause to the jury, because the question of proximate cause in this case was not foreclosed as a matter of law by Stanley or Throneberry , and sufficient facts supported the proximate-cause element of Mr. Moody's negligence claim. Accordingly, we deny the first point.[8]
In the second point, the Board argues that the circuit court erred in submitting Mr. Moody's claim to the jury because he failed to show that Officers Brulja and Sevier were negligent or thereby breached any duty owed to him. According to the Board, whether a plaintiff's claim constitutes a viable cause of action raises a question of law that we should review de novo. Once again, we are constrained to disagree. The Board argues this point by addressing the sufficiency of the evidence to show duty and negligence, the first two elements required to establish liability under a negligence theory. Thus, we apply the standard of review used above in addressing proximate cause and decide whether "the plaintiff presented a submissible case by offering evidence to support every element necessary for liability." McGhee, 502 S.W.3d at 666.
In essence, the Board argues that the police did what they were supposed to do and did it the way they were supposed to do it. The police owe a duty to the general public to pursue and arrest law breakers *794 such as Mr. Fields. The Board claims that Mr. Moody "could not and did not contest these facts at trial"; instead, he "claimed that the police officers owed to him ... a duty not to pursue and arrest the suspected drunk driver they saw speeding through red lights in the early morning hours of January 14, 2012." This characterization of what Mr. Moody sought to prove misses the mark.
In Oberkramer , our supreme court set forth a police officer's two standards of duty as "the obligation to apprehend the traffic violator and prevent him from doing any harm to innocent users of the highway, and, second, ... the obligation to pursue the traffic violator in a manner that is neither careless, reckless, or wanton." Oberkramer , 706 S.W.2d at 442. The court recognized that "[i]n most decisions finding liability on the part of police officers, the plaintiff alleged specific violations of statute or formal policy on the part of the police officer." Id. Because the plaintiff in Oberkramer had failed to allege anything other than that the police officers were negligent in speeding at 100 miles per hour during their pursuit, the supreme court determined that insufficient facts had been alleged to raise "the magnitude of the risk beyond that contemplated in section 304.022" and, thus, the circuit court had not erred in dismissing the second amended petition.[9] Id. at 441-42. The Board reads Oberkramer and section 304.022 as allowing police officers essentially carte blanche when they face an "emergency." We agree that police officers have discretion to initiate, continue, or become involved in a vehicle pursuit, and may, in emergency situations, proceed past stop signals, "but only after slowing down as may be necessary for safe operation," and exceed the speed limit "so long as the driver does not endanger life or property." KCPD Police Vehicle Pursuit Procedure, Annex B; § 304.022.5(2). Still, they are required to continually monitor the situation, and certain factors weigh against a high-speed vehicle pursuit. The Board emphasizes testimony showing that the officers believed that Mr. Fields presented a danger to the public that exceeded the danger presented by his remaining at large. He was, for example, observed speeding through traffic signals and driving erratically even when not pursued by the police.
Disregarding evidence conflicting with the jury's verdict as we must on this review, we find that Mr. Moody presented evidence showing, among other matters, that, in alleged violation of KCPD vehicle-pursuit policies (1) the officers' conversations indicated that the chase was a personal challenge; (2) the officers had information from which they could have identified Mr. Fields and apprehended him at a later time, but chose instead to pursue him;[10] (3) the pursuit took place over roads with icy patches, and Mr. *795 Fields drove the SUV erratically at very high speed, forcing other vehicles off the road, creating danger to the public that a jury could have found exceeded the danger presented by his remaining at large; and (4) tire-deflation devices were deployed in a manner that did not ensure public safety.[11] Accordingly, more than just the officers' speed was involved in the allegations and evidence of negligence, so we do not have a basis for concluding, as requested by the Board, that Mr. Moody did not present sufficient evidence of duty and negligence. This point is denied.
In the third point, the Board argues that the trial court erred in submitting a verdict director that did not require the jury to find that the police officers acted unreasonably in pursuing Mr. Fields. To preserve an instructional error, a party must make a specific objection to the instruction it considers erroneous before the jury retires. Rule 70.03. That objection must be stated distinctly and include the grounds for the objection. Rule 70.03. The reason for this requirement of making a timely and specific objection is "to afford the trial court an opportunity to correct any mistakes immediately and inexpensively without risking the delay and expense of an appeal and a retrial." Howard v. City of Kansas City , 332 S.W.3d 772, 790 (Mo. banc 2011) (citations omitted).
During the instruction conference, the trial court presented the jury instructions to counsel, including their numbering, and noted that the verdict-directing instruction was Number 8. The Board did not object to the numbering. The court then invited the parties to state whether they had any objections to the substance. The Board stated that, by way of objection to the substance, it wished to submit a verdict director. The court marked its submission as Court's Exhibit A and marked it refused. That was the full extent of the Board's objection to and discussion about the substance of the verdict director, which the trial court then read to the jury. The Board did not file its proffered verdict director, and it is not part of the record on appeal.[12] Nor did the Board object to the *796 trial court's failure to give its alternative instruction. In its motion for judgment notwithstanding the verdict or for new trial, the Board simply argued that "[n]o case law supports the Court's submission of a verdict director that did not require the jury to find that it was 'unreasonable' for police to continue their pursuit of Jamel Fields." It does not cite a relevant Missouri Approved Instruction reflecting its contention that dangerous police pursuits are not unreasonable and, in fact, are expected. Nor is its argument necessarily encapsulated in the purported proffered verdict director, which is phrased in terms of the officer's reasonable belief and not on whether the police had acted unreasonably. Because timely objections to instructions "are required as a condition precedent to appellate review," we find that the Board has failed to preserve the issue. Id. This point is denied.
Because we find that the trial court did not err in submitting Mr. Moody's negligence claim to the jury, the evidence of negligence and breach of duty was sufficient to go to the jury, and the Board did not preserve its instructional error, we affirm the judgment as to liability in Mr. Moody's favor.
Legal Analysis
Mr. Moody's Cross-Appeal
In the first point of the cross-appeal, Mr. Moody argues that the trial court erred in (1) admitting evidence, over objection, of the amount he received in settlement of his claims against other defendants, and (2) amending the judgment to reduce the jury's verdict by that amount, because "offset or credit is an affirmative defense" and it was never properly pleaded. Less than two weeks before trial, the Board was given leave of court to file an amended answer to Mr. Moody's third amended petition, purportedly raising the following affirmative defenses:
16. Defendants are entitled to any credits or offsets applicable to Plaintiff's alleged damages.
17. Plaintiff's claims against Defendants are to be reduced as a matter of law by the amount of any settlement, release, covenant not to sue or covenant not to enforce a judgment that may occur prior to or during trial pursuant to Section 537.060, RSMo., including but not limited to those with the City of Kansas City, Missouri, Stop Stick, Stop Tech, Automobile Club of Missouri, Avis Budget Car Rental, Jam[e]l Fields, and any other tortfeasors.
Out of the jury's presence and after Mr. Moody indicated during trial that he had no rebuttal evidence, the trial court invited the parties to enter a stipulation as to the amounts that Mr. Moody had received in settlement of his claims. Counsel for Mr. Moody objected, stating "I don't want to be accused of trying this case by consent, but I will comply with the Court's order, and I will tell the Court, given that I'm ordered to do so, if I can preserve the objection that I don't agree to have it tried by consent." The court did not understand the objection, so Mr. Moody's counsel further stated, "I think there's some case law on this issue that says, you know, that we stipulate to the amount or something like that. I might waive an objection that I *797 would otherwise have and be accused of allowing by consent the admission of and subsequent assessment of offset or credit." The court then asked counsel, "Under the statue [sic] do you dispute that they are not entitled to a setoff if you were to obtain a judgment?" Mr. Moody's counsel replied, "I don't think it's been properly planned [sic], and don't think that there's proper evidence for it, and that's my objection." The court overruled the objection, and counsel for the Board then stated, "Your Honor, we understand the total amount to be $600,000."
The court issued an amended judgment after the jury returned a verdict for $1 million, reducing the amount of the award by $600,000 under section 537.060, finding that the Board had pleaded and proved that Mr. Moody had been awarded that amount "from other parties for his injuries." Mr. Moody filed a motion to alter or amend the judgment to omit the offset or credit, arguing that it was not properly pleaded or proven at trial and citing in this regard, International Division, Inc. v. DeWitt & Associates, Inc. , 425 S.W.3d 225, 229-30 (Mo. App. S.D. 2014). The trial court denied the motion.
On appeal, Mr. Moody again cites International Division , as well as Missouri Rule of Civil Procedure 55.08, which requires payment and release to be pleaded as an affirmative defense. In International Division , the court stated that "reduction, like all affirmative defenses, must be pleaded or it will be waived." International Division , 425 S.W.3d at 231. These issues may be considered, however, "when they are tried by implied or express consent of the parties." Id. While the Board may not have pleaded the exact amounts of the settlements, Mr. Moody did not dispute that settlements with other tortfeasors had occurred or their amounts. For the most part, Mr. Moody simply objected to the procedural aspects of trying a reduction defense. Nowhere in his briefing does he contest the Board's assertion that he had already received $600,000 for his injuries. In light of the longstanding common law rule that "a plaintiff is entitled to one satisfaction for a wrong," and given that the Board raised reduction as an affirmative defense and that Mr. Moody entered into the settlements with other joint tortfeasors and knew what those amounts were, the trial court did not err in amending the judgment. See McGuire v. Kenoma, LLC , 375 S.W.3d 157, 177 (Mo. App. W.D. 2012) ("A double recovery is a species of unjust enrichment"). This point is denied.
The second point on cross-appeal is whether the trial court erred in granting summary judgment to the Board on Mr. Moody's claim of a dangerous condition of public property. Because we have determined that the Board was properly held liable for Mr. Moody's injuries, there is no need to address this argument.
Conclusion
Mr. Moody presented a submissible case by offering evidence to support every element necessary for liability, and the Board has not preserved its claim of instructional error. We have determined as well that the Board pleaded reduction as an affirmative defense and that Mr. Moody challenged neither the fact nor the a mount of settlements with other joint tortfeasors. Accordingly, we affirm the trial court's judgment.
Anthony Rex Gabbert, P.J., and Gary D. Witt, J. concur.

"We view 'the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict.' " McGhee v. Schreiber Foods, Inc. , 502 S.W.3d 658, 666 (Mo. App. W.D. 2016) (citations omitted).

According to deposition testimony introduced during trial, the driver's blood alcohol level was estimated to be .249 when the collision that injured Mr. Antoine Moody occurred.

Some four minutes into the chase, Officer Matt Sevier can be heard on the audio portion of the dash-cam video reporting the SUV's location as "83 and Troost northbound." He also stated, "He's about 60 mile [ ] an hour." Just seconds later the video display showed the officers' speed as 70 miles per hour with the pursued vehicle accelerating on a straightaway and pulling away from the officers. An unidentified officer can be heard saying, "Can we stick it?" After a two-second pause, another unidentified officer can be heard saying, "Affirmative." Three seconds later, Officer Scott Brulja reported that the SUV driver, "is coming up on seven seven [77th St.]." Nearly twenty seconds after reporting the SUV's speed as 60 miles per hour, Officer Sevier stated to dispatch, "He's about 80 mile[ ] an hour." One second later, Officer Brulja stated, "He's pushin' 100 miles an hour. Tell 'em to look out." Then Officer Brulja states, "He's losing it. He lost it." Nothing was said about icy patches on the roadway, the SUV driver's evident acceleration, or the presence of other motorists on the same road during the pursuit.

The Board has repeatedly suggested that Mr. Jamel Fields "steered" the SUV into Mr. Antoine Moody's vehicle, a misstatement of the actual facts. Mr. Fields hit the stop sticks at high speed and, according to Officer Brulja's testimony, "lost control" of the SUV. This factual distinction is important because the Board has faulted Mr. Moody for failing to have Mr. Fields testify about what he was thinking when he crashed the SUV so as to bolster its argument that conjecture and speculation undercut Mr. Moody's liability theory.

The petition included the stop-stick manufacturer among the defendants.

In addition, on summary-judgment review, we uphold the court's grant on appeal "if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist." Frazier , 467 S.W.3d at 333. We accept as true the facts "contained in affidavits or otherwise in support of a party's motion ... unless contradicted by the non-moving party's response to the summary judgment motion." Id. And further, the defending party establishes a right to judgment as a matter of law by showing (1) facts negating "any one of the elements of the claimant's cause of action"; (2) the non-movant, despite an adequate discovery period, has not produced and will be unable to produce sufficient evidence for "the trier of fact to find the existence of any one of the claimant's elements"; or (3) "there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly [ ]pleaded affirmative defense." Id. We set forth the standard of review on the appeal of a summary-judgment grant to distinguish it from the standard we must apply in this case, which concerns the court's purported erroneous denial of a motion for judgment notwithstanding the verdict.

As support for this concept, our Court cited Kilmer v. Mun , 17 S.W.3d 545, 551 n.19 (Mo. banc 2000), a dram shop-related case in which the supreme court distinguished legislative from judicial functions-i.e., the legislature defines proximate cause in certain instances, and the judicial process is used to determine whether it exists in a given case. Frazier, 467 S.W.3d at 337. The court in Kilmer illustrated the "judicial function" by indicating that proximate cause is a matter for the jury, which is instructed to find "whether the plaintiff's injury was the direct result of the defendant's breach of duty, and more than one cause may be found." Kilmer , 17 S.W.3d at 551 n.19. The facts in Frazier are discussed in more detail below.

The Board has not challenged the verdict director used by Mr. Moody to submit the Board's vicarious liability of Officer Brulja's negligent operation of a motor vehicle, other than to complain, as we discuss below that it did not require the jury to find that Officer Brulja acted unreasonably. We do not address, therefore, whether the disjunctive submissions included in the verdict director tendered by the court were properly framed to support submission in the context of Mr. Moody's ability to establish proximate cause. That discussion would implicate unraised and thus unpreserved instructional error.

Section 304.022 RSMo. (2012 Supp.), allows emergency vehicles to exceed the speed limit and ignore traffic signals, such as stop lights and signs, when this can be done safely. Because Mr. Moody focuses more on the officers' alleged negligent actions in (1) reinstituting the pursuit of a suspected drunk driver by not waiting for him to step outside his vehicle before alerting him to their presence, despite his apparent intention to get out of his vehicle, and (2) continuing to pursue despite demonstrated danger to other drivers, he has made more than just speed a factor in the officers' alleged negligence. He also alleged and introduced evidence of other conduct that violated the KCPD police vehicle-pursuit policy.

It became known only after the pursuit ended that the SUV was a rental and that Mr. Fields was not the person who had rented it. Post-pursuit conversations among the officers captured by the dash-cam and played for the jury indicated, however, that the officers were familiar with Mr. Fields, his family, and where he lived.

Among other matters, Mr. Drago testified that the officers did not follow proper procedure in renewing the pursuit after a suspected drunk driver had "gone to ground," that is, stopped the SUV when he believed he was no longer subject to a police pursuit and no longer posed a danger to the public. Mr. Drago testified about data showing that a significant percentage of police vehicle pursuits end in crashes and, if the police have other ways to apprehend a suspect, those approaches would be preferable to reinstituting a vehicle pursuit, particularly where the suspect has committed traffic violations only and is suspected of being intoxicated. Mr. Drago noted that the KCPD's vehicle-pursuit policy indicates that if the pursued suspect can be identified or is subject to capture at another time, this factor should weigh into a decision not to initiate a pursuit. Mr. Drago also explained that the officers' comments, as they searched a residential neighborhood after the first chase had ended, indicated that they had violated a policy requiring that "[t]he element of personal challenge to the officer" not "enter into a decision to pursue." In Mr. Drago's view, Mr. Fields "demonstrated that he would stop once the police left him alone and he also demonstrated that he was getting out of the car." KCPD's vehicle-pursuit policy allows pursuit where the suspect "presents a clear and immediate danger to the safety of others" and where "a dangerous felony" is involved. Mr. Drago testified that when Mr. Fields stopped and was getting out of the SUV, he did not present a danger to the public, nor had he committed a dangerous felony, as defined.

In its reply brief, the Board sets forth its proposed verdict director, in part, as follows:
Your verdict must be for plaintiff if you believe:
First, Officer Brulja initiated or continued a vehicle pursuit without a reasonable belief that Jam[e]l Fields presented a clear and immediate danger to the safety of others; ...