

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| NATALIE MCKINNEY, | ) | |
| | ) | **WD81339** |
| Respondent, | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | |
| CITY OF KANSAS CITY, | ) | **March 5, 2019** |
| MISSOURI, ET AL., | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable James Dale Youngs, Judge**

**Before Division Two:**
**Cynthia L. Martin, P.J., Victor C. Howard, and Thomas H. Newton, JJ.**

The City of Kansas City, Missouri appeals a Jackson County Circuit Court judgment entered on a jury verdict, awarding Ms. Natalie McKinney $220,214.55 for a hostile work-environment claim under the Missouri Human Rights Act (MHRA). The City argues that Ms. McKinney failed to present a submissible case and challenges the trial court's admission of "me-too" witness testimony. We affirm.[1]

---

[1] Ms. McKinney has filed a motion for an award of attorney fees incurred since the trial court's judgment was entered in September 2017. Because we grant that motion, we also remand for her to submit her final costs and fees to the circuit court.

Ms. McKinney, an African-American woman, began working for the City in 2005 at its hazardous waste facility and was terminated in January 2015.[2] During the last eight years of employment, she worked in the City's Industrial Waste Department under three different supervisors. Her final supervisor, Ms. Sherri Irving, a Caucasian woman, began her tenure in the department by announcing in the presence of several African-American employees that "she was driving the bus and if [the employees] didn't like the way she was driving . . . [they] could sit in the back or get off." The trial court allowed, as background, evidence about a number of time-barred incidents on which Ms. McKinney relied to prove her race-discrimination case. These incidents involved unusually prolonged efforts to be re-classified and paid according to extra work performed, discrimination complaints that languished in the City's Equal Employment Opportunity (EEO) office or remained unaddressed, a denied promotion, changed work hours and duties, and an altered performance evaluation. Evidence about incidents that were not time-barred included that Ms. McKinney was denied a promotion for a supervisory position that fit her job responsibilities and experience, but included specifications that appeared to fit Ms. Irving's qualifications, including supervisory experience, which Ms. McKinney lacked.[3]

---

[2] We view the facts in the light most favorable to the verdict. *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 71 n.2 (Mo. App. W.D. 2015) (citation omitted).

[3] The Caucasian man who wrote the job description and offered the position to Ms. McKinney's supervisor testified that he did so without an interview, because he knew the supervisor, having worked with her for about a year, and she was the only eligible applicant. Ms. Irving began her tenure with Kansas City in January 2013.

2

In addition, Ms. Irving denied Ms. McKinney's request for unpaid leave, despite working to accommodate other employees who requested leave but lacked the time available to take such leave, and Ms. McKinney was unable to secure the approvals she needed for an unpaid leave from the City's human resources department on the eve of departure. When Ms. McKinney returned from the unapproved leave, a cruise that a prior supervisor had approved months before the trip, she was subject to termination proceedings and was ultimately terminated for insubordination. This sanction was imposed despite the lack of a formal leave policy for exempt employees such as Ms. McKinney in the Industrial Wastewater Department and a progressive discipline policy that recommends termination only after a number of unscheduled absences.[4]

Ms. McKinney filed discrimination claims with the Missouri Commission on Human Rights, which issued a right to sue letter in November 2015. She timely filed a petition in Jackson County Circuit Court including claims of race discrimination, a hostile work environment, and retaliation, and seeking compensatory and punitive damages. Over the City's objections, the trial court allowed the jury to hear certain "me-too" testimony from witnesses who had also alleged experiencing workplace discrimination, albeit in other city departments, and, when they filed complaints with the City's EEO office, investigation of their

---

[4] The City argues in its reply brief that Ms. McKinney's counsel conceded on the record that a city-wide attendance policy applied to all employees, but we do not see that counsel made any concession about the lack of a leave policy for exempt employees, like Ms. McKinney, in her specific department. We ignore all contrary evidence and inferences in addressing a challenge to the sufficiency of the evidence.

complaints was mostly negligible or delayed, if it occurred at all.[5]  Although the trial court denied the City's motions for directed verdict after the close of Ms. McKinney's evidence and at the close of all the evidence, it explained at some length that, while it would allow the jury to consider each of Ms. McKinney's race-related claims, most of the evidence of conduct or incidents occurring before February 2014 were not actionable under her race-discrimination and retaliation theories as time-barred and did not fall within the continuing-violation exception.  It had allowed the evidence, however, as "admissible background evidence on Ms. McKinney's timely claims."  Regarding Ms. McKinney's hostile work-environment claim, however, the trial court found that whatever happened before February 2014 "that involved Ms. McKinney is subject to the continuing violation theory."  The jury returned a verdict in Ms. McKinney's favor solely on her hostile work-environment claim and awarded her $62,000 in

---

[5] Addressing the City's second motion in limine, the trial court acknowledged the significant ways in which these witnesses' experiences differed from Ms. McKinney's but said the following in addressing the similarities:

. . . their situations are similar in that each of them alleges that when they believe they were subjected to wrongful conduct, either discriminatory or harassment on the basis of some protected status, they made complaints to the EEO Department or Human Relations and requested that those allegations be investigated.  Their allegations are that those complaints fell on deaf ears.  There was no investigation.  There was no follow-up.  The complaints went unheeded.  And I think at least in one situation their claim was rerouted back to their managers who then subjected them to further harassment as a result.

So to my way of reviewing what I have in front of me right now, I believe that these witness's [sic] testimony as to their complaints to HR, to use that phrase generally, of their belief that they were being unlawfully or unfairly discriminated against and their allegation that HR did nothing to either investigate or try to resolve their complaints are all logically relevant to the Plaintiff's claim that the City did the same thing when she complained to them about the fact that she was being mistreated.

4

compensatory damages. The trial court denied the City's post-trial motions for judgment notwithstanding the verdict and for new trial. The City had argued that Ms. McKinney failed to make a submissible case and that the trial court erred in allowing "me-too" witness testimony. The trial court added attorney fees, costs, and interest to the verdict. The City timely filed this appeal.

**Legal Analysis**

In the first point, the City argues that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict as to the hostile work-environment claim, because the case was not submissible in that "timely, probative facts supporting that [t]he conduct was objectively and subjectively severe or pervasive harassment so as to constitute an abusive working environment" were absent. To determine whether a plaintiff has presented a submissible case "by offering evidence to support every element necessary for liability," the evidence is viewed "in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Moody v. Kansas City Bd. of Police Comm'rs*, 539 S.W.3d 784, 791 (Mo. App. W.D. 2017) (citation omitted). "Whether the plaintiff made a submissible case is a question of law that this Court reviews *de novo*." *Newsome v. Kansas City, Mo. Sch. Dist.*, 520 S.W.3d 769, 775 (Mo. banc 2017) (citation omitted). We reverse for insufficient evidence, "only where there is a complete absence of probative fact to support the jury's conclusion." *Moody,* 539 S.W.3d at 791.

5

The City challenges the sufficiency of the evidence solely as to the fourth of five elements of a hostile work-environment claim, that is, whether "a term, condition, or privilege of h[er] employment was affected by the harassment." *Alhalabi v. Mo. Dep't of Nat. Resources*, 300 S.W.3d 518, 527 (Mo. App. E.D. 2009). "Discriminatory harassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive enough to alter the conditions of a plaintiff[']s employment and create an abusive working environment." *Id.* "The conduct must be sufficient to create a hostile work environment, both as it was subjectively viewed by the plaintiff and as it would be objectively viewed by a reasonable person." *Id.*; *see also Fuchs v. Dep't of Revenue*, 447 S.W.3d 727, 732 (Mo. App. W.D. 2014) (stating that a claimant may also demonstrate that a term, condition, or privilege of employment has been affected "by proof of a specific, discrete adverse employment action[]"). "Once evidence of improper conduct and subjective offense is introduced, it is largely up to the jury to determine if the conduct rose to the level of being abusive." *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 84 (Mo. App. W.D. 2015) (citations omitted). When we assess "the hostility of an environment, we look to the totality of the circumstances." *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 245 (Mo. App. E.D. 2006).

The City first argues that this Court must disregard certain evidence in assessing whether Ms. McKinney introduced sufficient evidence to prove that "the conduct was objectively and subjectively severe or pervasive harassment so

6

as to constitute an abusive working environment." It contends, without any legal support, that this Court must ignore evidence pertaining to (1) discrete events that are not actionable because they happened before February 2014 or (2) claims on which the City prevailed. While we agree that certain discrete events are not actionable because they occurred outside the statutory time limit, "prior acts may be used as background evidence in support of a timely claim." *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 254 (Mo. App. W.D. 2012) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (stating that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act" but that the statute does not "bar an employee from using prior acts as background evidence in support of a timely claim.")). And this was exactly the basis on which the trial court ruled that the jury could consider the evidence with respect to Ms. McKinney's hostile work-environment claim. Thus, in analyzing the totality of the circumstances, we will consider evidence of otherwise unactionable conduct and events as background or under the continuing-violation

doctrine.[6]  As well, when we are asked to consider whether a case was submissible, we assess the evidence when it was submitted to the jury and not in light of a later-occurring verdict.  *See Sanders v. Ahmed*, 364 S.W.3d 195, 207 (Mo. banc 2012) (observing that question of submissibility "both at trial and on appeal" depends on the evidence of record at the point motion is made and stating, "A motion for directed verdict at the close of all evidence becomes the meaningful motion to preserve the issue as it presented itself to the trial court at that time, *prior to* submission to the jury." (emphasis added)); *see also Tisch*, 368 S.W.3d at 253 (ruling that in analyzing propriety of lower court's summary-judgment ruling, this Court was "not authorized to factor the subsequent jury verdict into [its] review").  It is only to preserve a submissibility question for

---

[6] We have explained the "continuing violation" theory applicable to discrimination claims brought under the MHRA as follows:

> Section 213.075 requires any person claiming to be aggrieved by an unlawful discriminatory practice to file a written verified complaint with the MCHR [Missouri Commission on Human Rights] within 180 days of the alleged act of discrimination. However, the timely filing requirement is subject to the principles of waiver, estoppel, and equitable tolling, including the "continuing violation" theory exception. Conversely, these equitable doctrines are to be applied sparingly in determining whether a charge of discrimination was timely filed.

> Under the "continuing violation" theory, a plaintiff may pursue a claim for an event that occurred prior to the 180-day statute of limitations for filing a claim of discrimination with the MCHR *if* the plaintiff can demonstrate that the event is part of an ongoing practice or pattern of discrimination by the employer. To take advantage of the "continuing violation" theory, a plaintiff must (i) demonstrate that at least one act occurred within the filing period; and (ii) show that the current claim of discrimination is part of a series of interrelated events, rather than isolated or sporadic acts of intentional discrimination. If the plaintiff proves both, then the 180-day filing period becomes irrelevant . . . and he may then offer evidence of the entire continuing violation.

*Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 252 (Mo. App. W.D. 2012) (citations omitted).  Here, the alleged discriminatory termination fell within the statute of limitations, and, as discussed further below, the other events, involving a small number of individuals as well as the City's EEO office, were not isolated or sporadic acts.

review that the party "who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the motion for a directed verdict." Rule 72.01(b). *See also Sanders*, 364 S.W.3d at 207-08 ("After verdict, of course, a motion for JNOV also is required to preserve the issues raised for appeal."). That the jury found in the City's favor on two of Ms. McKinney's claims is irrelevant to our determination about the case's submissibility, which we assess on the basis of the evidence introduced before the motion for directed verdict was filed.

The specific conduct and events about which Ms. McKinney introduced evidence include the following:

(1) Noticing that she was performing a significant amount of additional work in 2010-2012 due to her supervisor's medical absences, Ms. McKinney requested a desk audit that was conducted in May 2012 to determine whether her position should be reclassified and her salary increased. The completed and signed audit, which recommended a reclassification/ promotion, sat on the director's desk (Mr. Terry Leeds) until it was finally approved months later, following an EEO investigation, in March 2013.

(2) In August 2012, Ms. McKinney filed a complaint about the delay in implementing the reclassification with the City's EEO office. No contact was made with Mr. Leeds about the complaint until January 2013, which even City personnel considered to be an unusually long period of time between when a complaint is made and the accused is interviewed. The

9

EEO office did not conclude its investigation until March 2013, when it determined that the information was insufficient to substantiate Ms. McKinney's complaint that she had not been reclassified based on her race.

(3) Ms. McKinney also applied for a managerial position in 2012; without explanation, Mr. Leeds did not show up for her first scheduled interview and then made no eye contact with her during her interview, instead thumbing through his phone. She attributed his conduct to her complaint about the delay in her job reclassification.

(4) Ms. McKinney did not get that job, so she complained to the City's ethics hotline, and nothing came of the complaint. The job instead went to an individual who applied after the job posting had closed but during the two to three days that it reopened.

(5) As indicated above, when Ms. Irving came to the office, she made what Ms. McKinney considered to be an offensive comment to African-American personnel about going to the back of or getting off the bus.

(6) While Ms. McKinney's responsibilities increased after Ms. Irving arrived, she also testified that Ms. Irving ordered department employees to stop performing certain tasks and then told a superior that the employees were not getting certain work done. Ms. Irving agreed that some of the time-sensitive permits that Ms. McKinney worked on were delayed for lack of a signature, requiring that they be redone.

10

(7) Ms. Irving changed Ms. McKinney's work hours in June 2013 to allow the office to be open for "normal business hours" in the absence of Ms. Irving's predecessor, who was on sick leave. When the predecessor's sick leave continued into the school year, Ms. McKinney informed Ms. Irving that her hours needed to change to accommodate her children's return to school. Ms. Irving testified that she faulted Ms. McKinney for not telling her, when the change was made, that it could be a problem during the school year and informed her that an earlier start time would be conditionally allowed only. Ms. Irving also testified that she did not understand why Ms. McKinney had initially agreed to an 8-to-5 schedule without letting her know that such hours were unnecessary given office functions.

(8) According to Ms. McKinney, Ms. Irving was constantly rude, bullying, and disruptive, despite all the help Ms. McKinney provided to her in light of the many years since Ms. Irving had worked on the types of permits for which the department was responsible, and changed a performance evaluation that had been completed by Ms. Irving's predecessor before his retirement so that it reduced Ms. McKinney's raise from three percent to two percent. Ms. Irving had signed the predecessor's evaluation but then submitted her own evaluation of Ms. McKinney instead, downgrading her performance. Ms. McKinney's complaint to human resources about this matter did not result in any corrective action.

11

(9) Ms. McKinney took about a month of Family Medical Leave time off in October 2014, because she "was under so much stress and pressure dealing with [Ms.] Irving that [she] could not take it, not one more second." She also testified that she told another City employee that she was considering resigning because of the stress of interacting with Ms. Irving.[7] Ms. McKinney brought the problems she was having working with Ms. Irving to the attention of Ms. Irving's supervisor who essentially told her to work it out on her own.

(10) Despite Ms. Irving accommodating the needs of some employees who had exhausted their leave time and needed more time off, Ms. Irving refused Ms. McKinney's request for leave in November 2014, indicating that Ms. McKinney did not have sufficient time to take the leave. Ms. McKinney then sought unpaid leave, but was told she could not take unpaid leave, and attempted to secure human resources department approval for unpaid leave without success just before her departure. According to Ms. McKinney, Ms. Irving's predecessor had approved the leave in early 2014.

---

[7] Specifically, Ms. McKinney testified as follows:

> I told Rachel that I was thinking of resigning because it was too stressful of an environment for me to work with [Ms. Irving] and to have no intervention. I also had told Rachel that before [Ms. Irving's predecessor] had left, he had told me, he said, Natalie, you get you an attorney and you get out of here. Because they are trying to fire you by any means necessary. So you get out of here as quick as you can. Anxiety and fear. I was like, oh, my gosh, I would rather resign on my own terms than to be fired and not be employable. And so like I mean, I just couldn't handle the stress and the stress of the situation. I just couldn't do it.

(11) The City began taking steps while Ms. McKinney was out of the office to terminate her. This action was taken in the absence of any leave policy specific to an exempt employee in the Industrial Waste Department and despite a citywide policy of progressive discipline for repeat absences, including counseling, reprimand letters, and suspension. Her final day with the City was in January 2015.

(12) After Ms. Irving's predecessor retired, a job description that appeared to fit Ms. Irving's qualifications was created and posted. Ms. McKinney, who had performed the supervisor's job throughout his absences, applied for the position, but was never considered a viable candidate because she lacked the tenure and formal supervisory experience specified in the description. The City's EEO did not complete its investigation after she complained that she did not get the job due to race discrimination.

As in *Diaz*, this evidence was sufficient to show improper conduct and subjective offense. *Diaz*, 484 S.W.3d at 84. The City compares the improper conduct to which Ms. McKinney was subject with offensive sexual and disability harassment in other cases and argues that the evidence here did not rise to the level of severe or pervasive conduct. In its view, the alleged improper conduct Ms. McKinney faced "pale[s] in comparison." We disagree and cannot reverse because probative facts support the jury's conclusion. When the workplace office responsible for investigating claims of discrimination against a supervisor fails to act, lets such complaints languish, or prematurely terminates

13

discrimination investigations, affected employees would have to conclude that their complaints will not be taken seriously by an indifferent or possibly complicit employer. When supervisors and superiors sit on raises, promotions, and re-assesments, or fail to make eye contact during job interviews, such improper conduct is as damaging as unwanted physical contact or degrading comments. When a performance evaluation is improperly downgraded, resulting in a lower raise, a minority employee would be hard-pressed to conclude that race was not at issue. When a supervisor tells her superiors that work that was supposed to be done is not being done, and it was the supervisor who instructed the minority employees not to do work, the conclusion that they have been set up to fail is inescapable. When a supervisor and human resources personnel summarily refuse to accommodate the needs of a minority employee for time off, but work to help other employees in a similar situation, and then terminate that employee without giving a serious thought to a lesser sanction for taking time off without approval, motivation is clearly suspect. Recall, as well, that the supervisor who created a stressful work environment for a minority employee set the tone for her tenure by making a racist comment when she first met with department employees. We believe that a reasonable jury would conclude that this ongoing and pervasive conduct, subjectively perceived as racial harassment, added up over time to tell an African-American employee that, on the basis of her race, her work and expertise were not valued.

14

The evidence relating to the subjective manifestations that Ms. McKinney experienced included an ever-present fear of losing her job, stress induced by a supervisor who interfered with her work on a daily basis and an unresponsive human resources department, as well as the use of medical leave to deal with the stress. As in *Diaz*, this evidence was sufficient for the jury to conclude that Ms. McKinney was negatively affected by the hostile work environment. *Diaz*, 484 S.W.3d at 84. This point is denied.

In the second point, the City claims that the trial court abused its discretion in allowing, over objection, "me-too" witnesses to testify in that their allegations were not sufficiently similar to Ms. McKinney's nor did they fit within the legal theories of her case. It claims that it preserved this point by objecting to their testimony before they testified and by asserting it in the motion for new trial. Ms. McKinney argues that the City failed to preserve this point because it did not object to the "me-too" witnesses during trial. We agree. The trial court's ruling about these witnesses was made in response to the City's second motion in limine and occurred before Ms. McKinney's counsel made an opening statement or called any witness. To the extent that the direct examination of the "me-too" witnesses remained within the parameters of the court's preliminary ruling, the City did not raise any objection to their testimony. "A motion in limine, by itself, preserves nothing for appeal. After the denial of its motion in limine, a party is required to object at trial to the introduction of the evidence and to reassert the objection in post-trial motions." *Kerr v. Mo. Veterans*

15

*Comm'n*, 537 S.W.3d 865, 880 (Mo. App. W.D. 2017) (citations omitted). We may review this point, if at all, for plain error. Rule 84.13(c).

Under Rule 84.13(c), "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Although we have discretion to conduct plain-error review, such review "is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections." *Sasnett v. Jons*, 400 S.W.3d 429, 437 (Mo. App. W.D. 2013) (citation omitted). "We will reverse for plain error in civil cases only in those situations when the injustice of the error is so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *Id.* (citation omitted).

Federal courts have found error where trial courts "reject 'me too' evidence based solely on the fact that the other employees had a different supervisor or were fired by a different person." *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 122 (Mo. banc 2015). The inquiry is "'fact based and depends on many factors.'" *Id.* (quoting *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 388 (2008)). Evidence of improper conduct "at the hands of other decisionmakers may be admissible if this evidence would be relevant to the plaintiff[']s circumstances and theory of the case as determined through an individualized fact-based analysis applying [such] factors." *Id.* at 123. The court in *Cox* also quoted *Griffin v. Finkbeiner*, 689 F.3d 584, 598-99 (6th Cir. 2012),

16

which related the plaintiff's circumstances and theory of the case to factors such as "temporal and geographical proximity, whether the various decisionmakers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations of retaliation." *Cox*, 473 S.W.3d at 122-23. Significantly, "[t]here is no one set of agreed-upon factors, and no one factor is dispositive." *Id.* at 122.

The witnesses about whom the City complains neither worked in the same department in which Ms. McKinney worked nor worked under the same supervisory personnel. According to the City, this makes their testimony irrelevant because they were not similarly situated and their complaints lacked a probative connection to Ms. McKinney's circumstances and theory of the case. Each of these witnesses did, however, share a common experience with Ms. McKinney; they were City employees, alleged discriminatory treatment in the workplace, and had attempted to seek redress through the City's EEO office. Each met the same response—delayed action or no action. When employees follow prescribed procedures, some of them repeatedly, and meet with the same response, a jury could reasonably conclude that the City condoned a hostile work environment, allowing racial and sexual discrimination to occur across multiple departments and turning its EEO office into a "black hole" where complaints disappeared and enforcement of workplace anti-discrimination policies simply did not occur. This evidence was on all fours with Ms. McKinney's complaint about and evidence of a hostile work environment. In this regard, she alleged in

17

her petition, "Defendants knew or should have known of the harassment and failed to take prompt and effective remedial action."[8] The trial court did not err in allowing this testimony, and thus no plain error has occurred, let alone error so egregious as to undermine confidence in the outcome of the case. This point is denied.

## Conclusion

Because the evidence was sufficient to submit Ms. McKinney's hostile work-environment claim to the jury and because, under plain-error review, the trial court did not err in admitting the "me-too" witness testimony, we affirm. The MHRA authorizes the court to award court costs and reasonable attorney fees to the prevailing party, including those prevailing on appeal. § 213.111.2 RSMo. (2000 and 2017 Cum. Supp.). Accordingly, we grant Ms. McKinney's motion for attorney fees incurred since entry of the circuit court's judgment and remand to the circuit court for a determination of the amount of attorney fees and costs to be awarded.

/s/*Thomas H. Newton*
Thomas H. Newton, Judge

Cynthia L. Martin, P.J., and Victor C. Howard, J. concur.

---

[8] Elsewhere in the petition and incorporated by reference were the following allegations: (1) "Human Resources did nothing with the Desk Audit for nearly a year"; (2) regarding Ms. Irving's downgrade of her performance evaluation, "Plaintiff filed a grievance with Steve Morrison to Human Resources about the evaluation process. Plaintiff was not provided a hearing on her grievance."