

# *In the*
# *Missouri Court of Appeals*
# *Western District*

| | | |
|---|---|---|
| AMINA ALHALABI, | ) | |
| | ) | **WD85012** |
| Respondent, | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | |
| MISSOURI DEPARTMENT OF | ) | **March 7, 2023** |
| CORRECTIONS, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

### Appeal from the Circuit Court of Callaway County, Missouri
### The Honorable Jeff Harris, Judge

### Before Division Three:   Thomas N. Chapman, Presiding Judge,
### Mark D. Pfeiffer, Judge and Cynthia L. Martin, Judge

The Missouri Department of Corrections ("the DOC") appeals the judgment of the

Callaway County Circuit Court following a jury verdict in favor of Amina Alhalabi on

her hostile work environment claim.  The DOC raises two points on appeal challenging

the admission of the testimony of a "me too" witness and the award of attorney's fees.[1]

The judgment is affirmed, and the case is remanded with directions.

---

[1] The DOC originally raised another point in its appellant's brief challenging the verdict director
(point one), but withdrew the point in its reply brief, acknowledging that it did not object to the
verdict director on the ground raised in the point and declining to seek plain error review.  Its
point challenging the admission of the "me too" testimony (originally point two) will be referred

**Factual and Procedural Background**[2]

Amina Alhalabi was born in Lebanon and immigrated to the United States in September 2008 when she was in her thirties. She took her oath of citizenship in 2012. She has been Muslim her entire life.

Alhalabi began working as a corrections officer for the DOC at the Cremer Therapeutic Community Center in Fulton, Missouri, in January 2012. She came under the direct supervision of Lieutenant Charles Davis in January 2013. From the outset, Davis regularly mimicked and mocked Alhalabi's accent. He would repeat her words with an accent, laughing. Alhalabi testified, "One time I was in the control center. I run control center first floor. I was talking. He was repeating. I was almost going to cry and he start saying, 'Cry, cry. Come on, cry'.…I went to the bathroom and I cried there." Davis ridiculed Alhalabi's speech on a weekly basis, causing her to be embarrassed and upset, until she left her job with the DOC in February 2015.

In the spring of 2014, Lieutenant Davis assigned Alhalabi to transportation duty on two different occasions. The duty involved transferring inmates from the prison in Fulton to Cremer. During the transfer, the transportation officer might see an inmate naked when he changed into a Cremer uniform. Alhalabi asked Davis to be assigned a

---

to as point one in this opinion, and the point challenging the attorney's fees award (originally point three) will be referred to as point two.

[2] The facts are viewed in the light most favorable to the jury's verdict. *Williams v. City of Kansas City*, 641 S.W.3d 302, 310 n.1 (Mo. App. W.D. 2021).

different job because her religion strictly prohibited her from seeing any naked man other than her husband. Davis insisted that she do the job, and she "thought he doesn't care about my religious belief." On both occasions, Alhalabi went to Davis's supervisor, the chief of custody, Captain David Topash, and told him the job duty would violate her religious beliefs, and Topash relieved her of the duty. Davis was irritated and upset that Alhalabi had gone over his head. After that, Davis began frequently commenting about "Muslim people."

On one occasion when Alhalabi was working in the control center and could not walk away, Lieutenant Davis declared, only a few feet away from her, that "Muslim people are stupid. We're going to use all the gasoline, and when they are out, we will start using United States gas." His remark about Muslims made Alhalabi "feel upset, sad, and angry, like, 'Why he calling Muslim people this way and he know I am Muslim.'"

On another occasion when Alhalabi was sitting at the first floor desk, Davis walked by loudly singing, "I'm Christian, I'm Christian," and did not say anything else. Alhalabi was "uncomfortable because there was no reason to just come and just say that and leave."

In the summer and fall of 2014, ISIS, the terrorist group, was often in the news, and Lieutenant Davis often made comments to Alhalabi about the news. He equated "Muslim people" with ISIS, "instead of calling them ISIS, he was calling them Muslim." At the beginning of a shift one morning, the first thing Davis said to Alhalabi was, "We don't negotiate with terrorists." He repeated it three times, looking her in the eye, and

3

left without saying anything else.  He was repeating what the President had said the day before in response to the kidnapping of two Americans and its demand for ransom.  He also spoke to her about the beheading of James Foley, the American journalist, by ISIS and the video it posted, and again told her, "We don't negotiate with terrorists."  Alhalabi testified, "In 2014, ISIS did too many thing….[S]omething happen in the news, he will mention it to me the following day at work."  When she heard news about ISIS, she "would not be able to sleep all night because I was thinking about what will happen to me the follow day."  She would also be anxious and short of breath on her drive into work the next day.  Alhalabi reported Davis's comments about Muslim people to Captain Topash two times, but nothing was done to change Davis's behavior.

On September 2, 2014, Alhalabi was suffering from a very bad migraine but reported to work at 7:00 a.m. anyway because she knew they were short-staffed.  Her assigned post that day was first floor officer, but Lieutenant Davis reassigned her to the control center, which required more focus and responsibility.  Most activity in the prison, including the movement of inmates, officers, and visitors, is routed through and tracked by the control center, requiring a lot of attention and focus.  Although Alhalabi often worked in the control center, she was worried that, because of her migraine that day, she would not be able focus and would make a mistake that could impact prison safety by, for example, mistakenly opening a door that would allow an inmate to escape.  She politely asked Davis, "Sir, I only come to work today because I know you are short-staffed.  I have migraine.  I cannot work this.  Can you please leave me my job duty?"  Davis

insisted that Alhalabi work the control center even though there were other officers also on duty who could have performed the duty.

Alhalabi's migraine worsened during the morning, and she began to see black spots affecting her ability to read the computer screen. At 11:30 a.m., she asked Lieutenant Davis if she could leave, and he told her no. She called him again at noon when other officers arrived and asked to leave, and he said that she could leave but that she could not use sick leave and would have to use annual leave. Before leaving, Alhalabi went to Davis's office to again explain that her migraine was getting worse, and Davis mocked her speech and said, "Go, go. Why are you still here?" Alhalabi responded, "I feel you treat me different because my national origin." Davis looked at her and said, "File a grievance, but you're not going to win." She then asked him to help her fill out a request to transfer to Algoa, a more dangerous prison than Cremer. Davis happily agreed. Alhalabi testified, "He helped me very gladly. He was so happy typing it for me….He was laughing. I felt like he was laughing because he—he know I'm leaving."

Alhalabi then went to Warden Cindy Steuber's office to ask her to sign the transfer request. Alhalabi was crying and recounted the events of the morning. She also informed Warden Steuber "that I told Lieutenant Davis that he treat me different because of my national origin." Steuber refused to sign the transfer request and said that she would find a solution.

That night, Alhalabi sent an email to Captain Topash telling him what had happened that day. She also wrote, "I believe [Davis] treats me different than the other officers because of my origin," by which she meant her national origin and religion. Captain Topash believed that he had forwarded the email to the warden, but there was no record that he did, and the warden testified that she did not receive it. Topash did not follow up with Alhalabi, Warden Steuber, or Lieutenant Davis about the email.

After that day, Davis began "digging for any mistake [Alhalabi] made….Even small mistake." On September 10, 2014, eight days later, Davis wrote up Alhalabi in a performance log for failing to properly account for a missing radio in a daily inventory kept by the control center. Two other officers on the other two shifts that day were also at fault for failing to account for the radio, but they were only verbally counseled by their lieutenants, while Alhalabi got a written performance log, which is used in the annual performance evaluation. Lieutenant Davis had never given Alhalabi a negative write-up before.

In October 2014, Alhalabi asked Davis if she could have a day off to celebrate Eid al-Adha, which she explained to him was an Islamic holiday, and Davis said no. Alhalabi went to Captain Topash and explained the importance of the holiday to her. Topash talked to Davis, and Davis called Alhalabi an hour later approving her request.

Meanwhile, Lieutenant Davis continued to mock Alhalabi's speech and make comments to her about Muslims. In November 2014, Alhalabi applied for several jobs within the DOC, including the evening shift (3:00 p.m. to 11:00 p.m.), because she no

6

longer wanted to work with Davis. Captain Topash told Alhalabi that she could not have the evening shift, and she did not get any of the other jobs.

Three incidents occurred with Lieutenant Davis in the two-day period of January 20-21, 2015. First on January 20, 2015, Alhalabi asked Davis if she could take off Saturday, January 24, to be with her family, and Davis verbally approved the request. Later, he told her that she could not have the day off because it was transportation day, and a certain number of officers were needed to transport an inmate who was going home to the train station. Alhalabi asked Davis to count himself as he normally did for other officers, but Davis said, "I will do that for them, but not for you."

Later, on January 20, Alhalabi was in the search station near the control center when Lieutenant Davis and two other officers standing only a few feet away were talking about the movie, American Sniper, which was about Navy Seal Chris Kyle and his role as a sniper in the Iraq War. Looking directly into Alhalabi's eyes and wanting to make sure she heard him, Davis commented that "[h]e wished to be American Sniper and go to Middle East and kill Arab and Muslim people." Alhalabi felt directly insulted and upset because Davis knew that she was Muslim and that she had family living in Lebanon. She testified, "[W]hen he said he want to go to Middle East and kill Arab and Muslim people, I felt like he going to hurt my family or my friend because they live in Middle East." That night, Alhalabi thought about quitting her job but decided that she could not afford to.

7

The next day, January 21, 2015, a new offender, Marcus Talton, was admitted to Cremer. Alhalabi described him as "unstable, crazy, violent." Somebody warned her, "Be careful and watch your back." Talton was sentenced to drug and alcohol treatment but refused to participate in the program and was, therefore, confined to administrative segregation. After his assignment to administrative segregation, his behavior worsened. According to Alhalabi, "He was pacing. Every time he see me, he would start chanting 'Pretty woman.' He put his face in the window—little window. He start open his eye very wide, making scary face. And he was talking to himself, laughing for no reason." Alhalabi was assigned to escort Talton to the nurse's office. Given the circumstances, she called for another officer to help her escort him. She "was scared if he go to kiss me or bite me." Alhalabi's decision to request help in escorting Talton was consistent with the safety policies of the prison that if an officer feels unsafe in escorting an inmate, he or she should request assistance. Later that day, Davis radioed Alhalabi and instructed her to meet him in the dining room, which was dark and empty at the time. He criticized her for seeking assistance in escorting Talton, "You have been here for three years and you're still asking for help." Alhalabi responded, "I always do the job by myself. I don't ask for help only when I need it. But this is a crazy, unstable offender. How come you want me to take him by myself?" She explained that she would rather quit than escort a "crazy offender" by herself, and Davis told her that she should quit because every day there would be "crazy, violent offenders here." She said, "You don't care about my safety," and Davis stayed silent and said nothing to reassure her.

8

Lieutenant Davis's pointed references to American Sniper and his own desire to kill Arab and Muslim people, and his admonishment regarding her need for assistance in escorting a menacing prisoner, made Alhalabi fear for her personal safety.

Two days later, on January 23, 2015, Alhalabi submitted her resignation by email to Captain Topash, effective two weeks later. In her exit survey, Alhalabi recounted the three incidents with Lieutenant Davis earlier that week—the request for a day off, the sniper comment, and the escorting of Talton. At an exit interview, Warden Steuber asked Alhalabi about the incidents in her exit survey. Alhalabi, in turn, asked if she could be moved to a different job with a different supervisor, and the warden said that was not possible.

On January 27, 2015, pursuant to the DOC's anti-discrimination policy, Warden Steuber sent a request for investigation to the Human Relations ("HR")[3] office in the DOC's central office regarding Alhalabi's complaint about Davis's American Sniper comment. Within the hour, Scott Phillips, the HR manager for the DOC, returned the request to Warden Steuber advising that an investigation by HR was not required and that Alhalabi and Davis's supervisor at the prison was to take whatever action he deemed appropriate. In his notes on the complaint, Phillips wrote, "As the complainant indicates that she does not perceive the comment as harassment towards her and there is no indication the alleged behavior has occurred more than this one instance, does not appear

---

[3] Throughout the evidence, "human relations" and "human resources" are used interchangeably. This opinion will refer to either term as "HR."

to rise to the level of requiring an HR investigation." On January 28, 2015, Captain Topash alerted Davis to Alhalabi's complaint against him concerning the American Sniper comment by asking him to answer, in writing, several questions about it. Davis denied the comment.

The next week, the first week of February, Lieutenant Davis called Alhalabi into his office to give her a performance log dated January 22, 2015, which criticized her for not escorting Talton by herself. It stated that it was important that she be "able to verbally engage inmates and successfully complete assigned tasks unassisted, even when the inmate or situation makes you uncomfortable doing it alone….[I]nmate making inappropriate comments or asking personal questions does not constitute the need for an additional officer to assist you or to complete the task for you." The performance log also stated, in part, that anytime "you feel that there may be a safety issue, do not hesitate to request another officer to assist you." Alhalabi responded, "Not what you said in the dining room, this is completely different." She also refused to sign the performance log and wrote, "False statement" on it. Davis started yelling at Alhalabi, "I'm done with you. I'm done with you." Alhalabi stepped back, and asked Captain Topash, who was in the adjoining office, "Did you hear him?" Topash replied, "Amy, I can't get involved." Topash told Lieutenant Davis that the performance log looked retaliatory since Davis did not give it to Alhalabi until after he was told about her allegation. Alhalabi's last day of work at the DOC was February 5, 2015.

On February 18, 2016, Alhalabi filed a petition against the DOC under the Missouri Human Rights Act ("MHRA"). She alleged claims of hostile work environment and constructive discharge. In particular, she alleged that she was the target of a two-year, ongoing pattern of harassment and discrimination by her immediate supervisor, Lieutenant Davis, based on her national origin and religion, including retaliation for her complaints of discrimination, which ultimately led her to leave her employment. She sought compensatory and punitive damages and attorney's fees. A five-day jury trial was held in June 2021. The jury returned a verdict in favor of Alhalabi on her hostile work environment claim and in favor of the DOC on her constructive discharge claim. It awarded Alhalabi $140,000 in actual damages, and declined to award punitive damages. The trial court entered judgment in accordance with the verdict.

Thereafter, Alhalabi filed a motion to amend the judgment to include attorney's fees and costs pursuant to section 213.111.2.[4] The trial court entered an amended judgment awarding $672,979.50 in attorney's fees, $6,902.60 in taxable costs, and $8,554.04 in non-taxable costs.

This appeal by the DOC followed. Additional facts will be discussed below where relevant to the DOC's points on appeal.

The DOC raises two points on appeal challenging the admission of the testimony of a "me too" witness and the award of attorney's fees.

---

[4] All statutory references are to RSMo 2000 unless otherwise indicated.

11

## Admission of "Me Too" Evidence

In point one, the DOC contends that the trial court erred in admitting "me too" evidence regarding a former DOC corrections officer, Stephen Bergeron. It argues that Alhalabi and Bergeron were not similarly situated because the harassment of Bergeron allegedly took place at an entirely different facility, involving different employees, in a different geographic region of Missouri hundreds of miles away, and over a different time period.

An appellate court reviews a trial court's evidentiary rulings, including the admission of "me too" evidence, for an abuse of discretion. *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015); *Dixson v. Mo. Dep't of Corr.*, 586 S.W.3d 816, 830 (Mo. App. W.D. 2019). "A ruling constitutes an abuse of discretion when it is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Cox*, 473 S.W.3d at 114 (internal quotes and citation omitted).

"As with other forms of evidence, circumstantial evidence of employment discrimination must be both logically and legally relevant to be admissible." *Id.* at 116. Evidence is logically relevant if it tends to make the existence of any consequential fact more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence that is relevant and bears on the principle issue of the case. *Id.*;

12

*Dixson*, 586 S.W.3d at 830. Evidence is legally relevant when its probative value outweighs its prejudicial effect. *Id.*

In evaluating the admissibility of "me too" evidence, "the inquiry is 'fact based and depends on many factors.'" *Cox*, 473 S.W.3d at 122 (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008)). "[C]ourts look to and weigh aspects of similarity as appropriate given the facts, context, and theory of the specific case at issue." *Id.* at 123 (emphasis omitted). *See also Dixson*, 586 S.W.3d at 830; *Hesse v. Mo. Dep't of Corr.*, 530 S.W.3d 1, 5 (Mo. App. W.D. 2017), *overruled on other grounds by Wilson v. City of Kansas City*, 598 S.W.3d 888 (Mo. banc 2020). "Evidence of improper conduct 'at the hands of other decisionmakers may be admissible if this evidence would be relevant to the plaintiff[']s circumstances and theory of the case as determined through an individualized fact-based analysis applying [such] facts.'" *McKinney v. City of Kansas City*, 576 S.W.3d 194, 204 (Mo. App. W.D. 2019) (quoting *Cox*, 473 S.W.3d at 123). Ways in which "me too" evidence may be related to the plaintiff's circumstances and theory of the case include "'temporal and geographic proximity, whether the various decision makers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations of retaliation.'" *Id.* (quoting *Cox*, 473 S.W.3d at 123). "There is no one set of agreed-upon factors, and no one factor is dispositive." *Cox*, 473 S.W.3d at 122.

In this case, the DOC filed a motion in limine before trial to bar the testimony of Bergeron. It stated that Bergeron was a corrections officer at the DOC until he resigned

13

in September 2013, that he worked at the Southeast Correctional Center ("SECC") in Charleston some four hours and 250 miles away from Cremer, and that he was raised Catholic but identified as Muslim, was Caucasian, and was born in Canada. It stated that Bergeron was not aware of Alhalabi's allegations or any discrimination complaints by anyone at Cremer, did not know any witnesses to Alhalabi's claims, and did not know anyone that worked at Cremer. The DOC further stated that before he quit in 2013, Bergeron made a written complaint about a supervisor, which included generalized statements that unspecified coworkers called him a "terrorist" and a "snow n****r," that Bergeron withdrew his complaints about slurs made by unspecified coworkers, and an HR officer investigated his complaint against the supervisor. The DOC argued that the "me too" evidence of Bergeron should not be admitted because there was no commonality between Alhalabi's claims and Bergeron's complaint, as Bergeron worked at a different facility, and the witnesses, decision-makers, and time periods were different.

At trial, and over the objection of the DOC, Alhalabi played parts of Bergeron's videotaped deposition for the jury; introduced the complaint Bergeron submitted to HR officer Joni Light, regarding the conduct of his supervisor, Paula Huffman-Phillips; and also admitted into evidence HR officer Light's Report of Investigation. In the complaint dated June 23, 2013, Bergeron stated that supervisor Huffman-Phillips "was treating me in a punitive manner and that my workplace environment had become increasingly hostile." He also stated, in part, "It has become acceptable at this camp to refer to me in a

14

derogatory manner....I am told…I am a snow n****r (I'm a non-American citizen on a green card), I am a terrorist (I'm Muslim)….I hear these comments from supervisors and officers alike and I am expected to smile and move on with my day all the time having to also deal with [Functional Unit Manager] Huffman-Phillips and her very transparent vendetta."

Light's Report of Investigation showed that on June 28, 2013, the warden of SECC sent a request to the DOC's HR office to investigate Bergeron's allegations of a hostile work environment, specifically, harassment by Huffman-Phillips regarding his job performance and other staff members' perception of him at SECC. While the Light Report addressed Huffman-Phillips's treatment of Bergeron regarding his job performance, it did not address Bergeron's complaints regarding unspecified supervisors' and officers' derogatory comments to him regarding his national origin or religion.

Bergeron had previously testified in a videotaped deposition, and parts of that deposition were played for the jury. In a discussion between the trial court and the attorneys at trial, it was indicated that a written transcript of the videotaped deposition would be attached to the trial transcript, but it is not included in the trial transcript in the record on appeal. In her respondent's brief, Alhalabi states that a transcript of the excerpts from Bergeron's deposition that was played for the jury could be found with her trial exhibits filed with this court. While her index of exhibits lists the transcript as an exhibit, the transcript is not found in Alhalabi's exhibits in the record on appeal. Nevertheless, it was not Alhalabi's responsibility to ensure that the deposition transcript

15

was part of the record. Rule 81.12(a) provides, "The record on appeal shall contain all of the record, proceedings and evidence necessary to the determination of all questions to be presented, by either appellant or respondent, to the appellate court for decision." Rule 81.12(c) directs the appellant to order the transcript. Thus, "[p]ursuant to Rule 81.12, the appellant has the duty to order the transcript and compile the record on appeal for the reviewing court to determine the questions presented; without the required documents, the Court has nothing to review." *E.Y. v. C.T.*, 644 S.W.3d 325, 327 (Mo. App. E.D. 2022) (internal quotes and citations omitted). "Where no transcript is filed, such evidentiary omission will be taken as favorable to the trial court's ruling and unfavorable to the appellant." *In re Estate of Abbott*, 944 S.W.2d 279, 284 (Mo. App. S.D. 1997). In this point, the DOC challenges the admission of the Bergeron "me too" evidence, which included his deposition testimony, but failed to include the testimony in the record on appeal.[5] While Bergeron's complaint and HR's Report of Investigation is included in the record on appeal and is available for review, it is impossible for this court to review Bergeron's testimony for purposes of this point.

In arguing that the Bergeron "me too" evidence should not have been admitted, the DOC complains that Bergeron and Alhalabi had "little to nothing in common except that they both worked for the [DOC] and made allegations of harassment." It argues that

---

[5] Notably, the DOC cites only to its motion in limine in discussing Bergeron's deposition testimony in its argument in this point. Its motion in limine cited to the transcript of Bergeron's deposition indicating that the DOC had the transcript when it wrote the motion, but the motion also did not include the transcript.

Bergeron did not know Alhalabi or anyone who worked with her and was unfamiliar with anyone involved in investigating her allegation and that his alleged harassment took place at a different facility, involving different people, in a different geographic region of Missouri hundreds of miles away, and over a different time period.

Bergeron and Alhalabi, however, held the same positions at the DOC (corrections officer) during the same general time period (Bergeron 2013 and Alhalabi 2012-2015). They both were Muslim and were born in another country (Bergeron from Canada, Alhalabi from Lebanon). Both officers were targeted by co-workers or supervisors based on their religion and country of origin. They were both subject to the DOC's anti-discrimination policy, which was enforced by the same HR office.

Furthermore, and importantly, the complaints of discriminatory harassment made by Bergeron and Alhalabi were brought to the attention of the DOC's central HR office, which failed to act in each case. Part of Alhalabi's theory of the case was that the DOC's HR office condoned the hostile worker environment she experienced by failing to investigate it and doing nothing to stop it. Alhalabi presented evidence that she informed Warden Steuber in her exit survey and exit interview about Davis's statement that he wanted to go to the Middle East and kill Arab and Muslim people like the American Sniper. Pursuant to the DOC's anti-discrimination policy, the warden sent a request for investigation to the DOC's central HR office regarding Alhalabi's complaint about Davis's comment. As the DOC's HR manager, part of Phillips's responsibility was to review requests for investigation regarding complaints of discrimination, harassment, or

17

retaliation for all work sites in the state to determine whether additional information was needed to clarify the complaint, to deny the request for investigation and send the complaint back for supervisory action if nothing shows discrimination, harassment, or retaliation, or to assign it to an HR officer for full investigation. Within an hour of receiving the request for investigation in this case, Phillips returned it to Warden Steuber, without seeking any additional information, advising that Alhalabi and Davis's supervisor at the prison was to take whatever action he deemed appropriate, effectively denying the request for investigation. Bergeron's experience paralleled Alhalabi's and, as such, provided probative support for her theory.

This case is similar to a recent case, *McKinney v. City of Kansas City*, 576 S.W.3d 194 (Mo. App. W.D. 2019). In *McKinney*, the plaintiff was an African-American woman who filed a hostile work environment claim under the MHRA against her employer, the City of Kansas City, alleging offensive statements, unfair criticisms, interference with her job, reduction of a raise, and denial of unpaid leave by her supervisor. *Id.* at 196-97, 201-02. Investigations of her complaints of racial discrimination to the defendant's Equal Employment Opportunity office were either not completed or resulted in no corrective action. *Id.* at 201-02. The trial court allowed "me too" testimony from witnesses who had also filed complaints of discrimination with the defendant's EEO office that went unheeded, even though the witnesses worked in different departments under different supervisors. *Id.* at 197-98. On appeal, the defendant argued that the "me too" witnesses' allegations were not sufficiently similar to the plaintiff's and did not fit within the theory

of her case. *Id.* at 203. This court rejected the argument and found that the trial court did

not err in allowing the testimony:

> The witnesses about whom the City complains neither worked in the same department in which Ms. McKinney worked nor worked under the same supervisory personnel. According to the City, this makes their testimony irrelevant because they were not similarly situated and their complaints lacked a probative connection to Ms. McKinney's circumstances and theory of the case. Each of these witnesses did, however, share a common experience with Ms. McKinney; they were City employees, alleged discriminatory treatment in the workplace, and had attempted to seek redress through the City's EEO office. Each met the same response—delayed action or no action. When employees follow prescribed procedures, some of them repeatedly, and meet with the same response, a jury could reasonably conclude that the City condoned a hostile work environment, allowing racial and sexual discrimination to occur across multiple departments and turning its EEO office into a "black hole" where complaints disappeared and enforcement of workplace anti-discrimination policies simply did not occur.

*Id.* at 204.

Part of Alhalabi's case was predicated on the theory that the DOC failed to

properly investigate and stop the discriminatory treatment of her. Bergeron and Alhalabi

shared common experiences at the DOC that made the Bergeron evidence probative of

Alhalabi's theory. While the DOC asserts that there were differences in their

experiences, "those differences were less relevant than their commonalities." *Hesse*, 530

S.W.3d at 5. Although "not similarly situated in all respects…their shared characteristics

made [Bergeron's] 'me too' evidence relevant and admissible." *Id.* Furthermore, the

DOC has not established that the prejudicial effect of the "me too" evidence outweighed

its probative value. The trial court did not abuse its discretion in admitting the evidence.

19

Point one is denied.

## Attorney's Fees

In its second point on appeal, the DOC contends that the trial court erred in awarding $672,979.50 in attorney's fees based on a lodestar amount of $448,653[6] and a multiplier of 1.5.  It argues that the trial court erred in applying the multiplier, and that the lodestar should have been reduced by at least 50% because Alhalabi had limited success (she prevailed on only one of her two claims), she was not awarded punitive damages, and she was awarded only a fraction of the damages sought.

An appellate court reviews a trial court's award of attorney's fees for abuse of discretion.  *Berry v. Volkswagen Group of Am., Inc.*, 397 S.W.3d 425, 430 (Mo. banc 2013); *Terpstra v. State*, 565 S.W.3d 229, 249 (Mo. App. W.D. 2019).  A trial court abuses its discretion when its decision is against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice.  *Berry*, 397 S.W.3d at 431; *Terpstra*, 565 S.W.3d at 249.

Missouri follows the American Rule, which provides that parties bear the expense of their own attorney's fees in the absence of statutory authorization or contractual agreement.  *Wilson v. City of Kansas City*, 598 S.W.3d 888, 896 (Mo. banc 2020).

---

[6] "The 'lodestar' is the starting point in determining reasonable attorneys' fees." *Harrison v. Harris-Stowe State Univ.*, 626 S.W.3d 843, 860 n.5 (Mo. App. E.D. 2021).  "The trial court determines the lodestar by multiplying the number of hours reasonably expended by a reasonable hourly rate." *Id.*

20

Section 213.111.2 authorizes an award of "reasonable attorney fees" to the prevailing party in an MHRA action. *Id.*

The determination of reasonable attorney's fees is generally committed to the trial court's discretion. *Id.*; *Terpstra*, 565 S.W.3d at 250. "The trial court is considered an expert on fees, given its familiarity with all of the issues in the case and with the character of the legal services rendered, and may determine attorney fees without the aid of evidence." *Terpstra*, 565 S.W.3d at 249 (internal quotes and citations omitted). "The lodestar is determined by multiplying the number of hours reasonably expended by a reasonable hourly rate." *Id.* at 250 (internal quotes and citation omitted). Relevant factors in determining the reasonable value and amount of statutorily authorized fees include (1) the rates customarily charged by the attorneys in the case and other attorneys in the community for similar services; (2) the number of hours reasonably expended on the litigation; (3) the nature and character of the services rendered; (4) the degree of professional skill required; (5) the nature and importance of the subject matter of the litigation; (6) the amount involved or the result obtained; and (7) the vigor of the opposition. *Wilson*, 598 S.W.3d at 896; *Berry*, 397 S.W.3d at 431; *Terpstra*, 565 S.W.3d at 250.

The DOC first argues that lodestar amount should have been reduced by at least 50% because Alhalabi had only limited success. Specifically, it asserts that she prevailed only on her hostile work environment claim and not her constructive discharge claim, her

claim for punitive damages was rejected, and she was only awarded $140,000 in damages out of the $530,000 she requested.

The DOC does not challenge the number of hours worked by Alhalabi's attorneys or their hourly rates. Instead, it challenges the lodestar amount as excessive in light of the results reached. The amount involved or the result reached is not, however, particularly relevant in human rights cases. *Wilson*, 598 S.W.3d at 896; *Harrison v. Harris-Stowe State Univ.*, 626 S.W.3d 843, 861 (Mo. App. E.D. 2021). Instead, a more significant factor is the nature and importance of the subject matter. *Id.* The MHRA "recognizes the public purpose served by litigation that vindicates the rights of those who are discriminated against." *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 523 (Mo. banc 2009). Furthermore, "[t]he Missouri legislature, in enacting the human rights act, followed the lead of Congress in the choice of authorizing fees to private attorneys for enforcement of human rights claims, rather than relying principally upon government agencies for such enforcement." *Id.*

While a court might consider the extent to which a plaintiff prevailed on some claims and not on others, "[t]he efforts of the prevailing attorneys…should not be discounted where the effort and proof were the same for the claims on which [the plaintiff] prevailed and those on which [s]he did not." *Id.* "[I]f the claims are so intertwined, with the legal work overlapping by the claims' shared legal theory and facts, then the attorney fees awarded should reflect the work expended on all the claims." *Holmes v. Kansas City Mo. Bd. of Police Comm'r ex rel. Its Members*, 364 S.W.3d 615,

22

630 (Mo. App. W.D. 2012). "Where a plaintiff's claims are related and she has obtained excellent results overall, her counsel should recover a fully compensatory fee that should not be reduced simply because she has not prevailed on every litigated claim." *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 94 (Mo. App. W.D. 2015) (internal quotes and citation omitted).

Contrary to the DOC's argument, Alhalabi's claims of hostile work environment and constructive discharge cannot be evaluated in isolation. They were not separate and distinct but intertwined and overlapping. Alhalabi's claims emanated from a common set of facts. Indeed, the theory of her case was that she was subjected to a hostile work environment by her supervisor and this hostile work environment prompted her to leave her job. The DOC has not identified any time expended on the constructive discharge claim that is severable from the hostile work environment claim.

Moreover, the trial court was not required to reduce the attorney's fees award because Alhalabi did not recover punitive damages. "Punitive damages may be proven by circumstantial evidence and there is no requirement of direct evidence of intentional misconduct as most employment discrimination cases are inherently fact-based and necessarily rely on inferences rather than direct evidence." *Brovont v. KS-I Med. Servs., P.A.*, 622 S.W.3d 671, 701 (Mo. App W.D. 2020) (internal quotes and citation). "The same evidence supporting the discrimination claim can also support a claim for punitive damages." *Id.* (internal quotes and citation omitted). *See also Ellison v. O'Reilly Auto. Stores, Inc.*, 463 S.W.3d 426, 435 (Mo. App. W.D. 2015) ("Proof offered to support an

23

employee's underlying substantive claim and the employee's additional claim for punitive damages need not be mutually exclusive, and often is not.") (internal quotes and citation omitted). Such is the case here. The same evidence presented to prove a hostile work environment from unwelcome harassment based on Alhalabi's national origin and religion was relevant to show the DOC's reckless indifference for purposes of punitive damages. That the jury did not elect to award punitive damages does not support reduction of attorney's fees.

Finally, a reduction in attorney's fees was not required because Alhalabi did not recover the full amount of damages that she sought. "When the plaintiff has prevailed on the underlying claim, attorney's fees should not be reduced merely because the plaintiff was not awarded the full amount sought." *State ex rel. Nixon v. Patriot Tobacco Co.*, 220 S.W.3d 889, 892 (Mo. App. E.D. 2007). "[E]ven small verdicts in MHRA cases may still reflect a high degree of success when properly considered in light of the nature and importance of the subject matter in the particular case." *Holmes*, 571 S.W.3d at 622 (internal quotes and citation omitted). In this case, the jury found that Alhalabi was subjected to a hostile work environment by the DOC and awarded her $140,000, a sum of over five times her annual salary at the DOC. Alhalabi obtained excellent results overall, and her attorneys should recover a fully compensatory fee.[7] The trial court did not abuse its discretion in failing to reduce the lodestar amount.

---

[7] Appellate courts have recently upheld several attorney's fees awards in MHRA cases that were higher than the damages awards. *See Harrison*, 626 S.W.3d at 852-53, 860-62 (total damages

24

The DOC also argues that this is not a proper case for enhancement of the lodestar amount by applying a multiplier. It contends that fee multipliers should only be applied in "rare" and "exceptional" circumstances and this is not such a case, and that Alhalabi's attorneys failed to show that they were unable to accept cases that guaranteed them an hourly rate.

In contending that multipliers should be "rare" and "exceptional," the DOC cites *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010), which identified six rules to evaluate whether a multiplier is appropriate. The Missouri Supreme Court, however, declined to follow *Perdue* and adopt the use of those federal guidelines in favor of retaining the trial court's traditional discretion to award attorney's fees. *Zweig v. Metro. St. Louis Sewer Dist.*, 412 S.W.3d 223, 249-50 (Mo. banc 2013); *Berry*, 397 S.W.3d at 432. Recently, fee multipliers have been upheld in several MHRA cases. *See Williams v. City of Kansas City*, 641 S.W.3d 302, 333-34 (Mo. App. W.D. 2021) (1.5 multiplier); *Gray v. Mo. Dep't of Corr.*, 635 S.W.3d 99, 105-108 (Mo. App. W.D. 2021) (1.5 multiplier); *Harrison*, 626 S.W.3d at 862 (1.25 multiplier); *Terpstra*, 565 S.W.3d at 251-52 (1.5 multiplier).

In determining whether to apply a multiplier, the trial court "should avoid

---

award of $32,000 for retaliatory discharge and total attorney's fees of $464,012.50, which included a 1.25 multiplier); *Holmes*, 571 S.W.3d at 610-611, 619-20 (total damages of $6,000 for retaliation and total attorney's fees of $226,562 with no multiplier); *Terpstra*, 565 S.W.3d at 236, 250-52 (total damages of $300,000 for age discrimination and total attorney's fees of $731,562.30, which included a 1.5 multiplier).

awarding a multiplier based upon facts that it considered in its initial determination of the lodestar amount." *Berry*, 397 S.W.3d at 432. Three factors that support use of a multiplier that are not duplicative of the factors utilized in calculating the lodestar amount are (1) that plaintiff's counsel's fees were always contingent; (2) taking plaintiff's case precluded counsel from accepting other employment that would have been less risky; and (3) the time required by the demands of preparing plaintiff's cause for trial delayed work on counsel's other work. *Id.* at 432-33; *Williams*, 641 S.W.3d at 333-34.

The evidence presented by Alhalabi's attorneys through their affidavits and billing statement showed that they expended over 1,000 hours over six years litigating Alhalabi's claims on a contingency fee basis. As explained by one attorney, Alhalabi's case involved a significant risk to them of a defense verdict and not being paid because of the limited back-pay that Alhalabi could recover (she obtained other employment within six months of leaving the DOC), the rural venue, Alhalabi's background, accent, immigration status, and her difficulty communicating well in English, and lack of settlement negotiations. Furthermore, the attorneys had to turn away less risky work and delayed work in their other cases because of the demands of this case. One attorney explained at the hearing on the motion for attorney's fees that he and co-counsel were unable to take safer cases like negotiating severance packages for executives to litigate Alhalabi's case.[8] The trial court found that the 1.5 multiplier was appropriate in this case

---

[8] The DOC's attorney stated at the hearing that he accepted Alhalabi's attorney's representation to the trial court that he turned away work because of this case.

to compensate Alhalabi's attorneys for the contingency risk they undertook, including the work they turned down to litigate this case and the time required to take the case to trial. The trial court's application of the 1.5 multiplier was supported by the evidence and not an abuse of discretion.

The trial court's attorney's fees award of $672,979.50 was not arbitrary or so unreasonable as to indicate indifference and a lack of proper judicial consideration.

Point two is denied.

### Motion for Attorney's Fees on Appeal

Before submission of this case, Alhalabi filed a motion for attorney's fees on appeal with this court, which has been taken with the case. Under this court's Special Rule 29, "[a]ny party claiming an amount due for attorney's fees on appeal pursuant to contract, statute or otherwise and which this Court has jurisdiction to consider, must file a separate written motion before submission of the cause." As noted in point two above, section 213.111.2 authorizes a court to award reasonable attorney's fees to a prevailing party. *Wilson*, 598 S.W.3d at 898. "A prevailing party is one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing the suit." *Id.* (internal quotes and citation omitted).

Alhalabi prevailed on her claim for hostile work environment and successfully defended the judgment on appeal. Having succeeded on a significant issue, she is a prevailing party. *Id.* This court is authorized under section 213.111.2 to award her reasonable attorney's fees on appeal. *Id.* "While appellate courts have the authority to

27

allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Berry*, 397 S.W.3d at 433 (internal quotes and citation omitted). Alhalabi's motion for attorney's fees on appeal is sustained, and the case is remanded to the trial court to award reasonable attorney's fees to her.

## Conclusion

The judgment is affirmed. The cause is remanded to the trial court to determine Alhalabi's reasonable attorney's fees for this appeal.

_____
THOMAS N. CHAPMAN, PRESIDING JUDGE

All concur.

28